92 A.3d 688

A. BLACK,[1] PLAINTIFF, v. B. BLACK, DEFENDANT.

Superior Court of New Jersey
Chancery Division Ocean County
Family Part

Decided June 26, 2013.

---

[1] Pseudonyms and initials are used in place of the parties' and children's actual names.

132

*Abigale M. Stolfe* for plaintiff (*Stolfe, Ziegler & Legreide,* attorneys).

*B. Black,* defendant pro se.

L.R. JONES, J.S.C.

This case presents three significant legal issues regarding a divorced parent's obligation to contribute to the cost of a child's college education, when he has previously agreed to do so in a matrimonial settlement agreement. For the reasons set forth in this opinion, the court holds the following:

1. When there is a damaged relationship between a college-age student and a parent, the court may order the student to attend joint counseling with the parent as a condition of the student receiving ongoing financial assistance from that parent for college tuition, so long as there is no compelling reason to keep the parent and student physically apart.

2. The option of attending college at a state college or a private college, at substantially less cost than the student's school of first preference, is a relevant issue for the court's consideration. The Appellate Division's reported opinion in *Finger v. Zenn,* 335 *N.J.Super.* 438 [762 *A.*2d 702] (App.Div.2000) does not hold to the contrary.

3. While the Supreme Court case of *Newburgh v. Arrigo,* 88 *N.J.* 529 [443 *A.*2d 1031] (1982) sets forth a list of factors for a court to consider on the issue of college contribution, a case may present additional equitable factors for consideration as well. One such additional factor is whether the student has younger siblings of relatively close age who are also likely to attend college in the near future. In such circumstance, there may be a need for implementation of a reasonable financial plan which fairly allocates present and future contemplated funding resources among all of the parties' children, rather than exhausting

such resources primarily or exclusively on the oldest child who happens to be first in line for college.

## FACTUAL BACKGROUND

Plaintiff and defendant were married for seventeen years. They had three children together, all within a six-year span. The parties divorced in July 2010, and entered into a comprehensive written matrimonial settlement agreement. Each party was represented by counsel at the time.

As part of the resolution, the parties agreed to share joint legal custody of their children, C.B. (then age 16), N.B. (then age 13), and J.B. (then age 10). By consent, plaintiff was named the children's primary residential custodian, with defendant having the right to reasonable and liberal parenting time. Additionally, as there were ongoing problems in the relationship between defendant and the oldest child, C.B., the parties agreed that father/son counseling would take place.

The parties concurred at the time that for support purposes, plaintiff had an imputed annual income of $20,000, while defendant had an imputed annual income of $60,000.[2] Utilizing these financial baselines, the parties further agreed that defendant would pay plaintiff $300 per week in alimony, along with child support under New Jersey's child support guidelines. Additionally, the parties jointly stipulated that they would each contribute to their children's future college costs. The exact amounts of such future contribution were left unquantified at the time. Specifically, the settlement agreement stated the following:

> The parties recognize they have a joint, but not necessarily equal, obligation to provide a college education or post high school education for the children. The precise amount of their respective contributions shall be determined at the time the college expense is incurred. This determination shall be based upon a review of each party's overall financial circumstances including their actual or imputed

[2] As noted later in this opinion, both parties are presently earning higher incomes, with defendant earning at the rate of $76,000 per year and plaintiff earning at the rate of $27,000 per year, not counting alimony.

income, as well as their assets and obligations including, but not limited to, the Husband's obligation to pay child support. . . .

The agreement did not address whether a parent's obligation to help fund college tuition for a child was dependent or contingent upon that child having an ongoing relationship with that parent.

Following the divorce, joint father/son counseling did not occur. While C.B. met with a counselor individually, he refused to participate in joint therapy, contending that he did not want to see his father because defendant treated him badly prior to the divorce.[3] Reciprocally, while defendant admitted that the father/son relationship had been hostile at times in the past,[4] he denied mistreating C.B., and pointed out that at no time did the police, or the New Jersey Division of Youth and Family Services (DYFS),[5] or any other investigating agency or court, ever find that he had abused, neglected, or mistreated C.B. or any of the other children.

While defendant asserted that he wanted to have a relationship with C.B. following the divorce, he did not pursue the issue as aggressively as he might have under the circumstances. Instead, joint counseling between father and son never took place, and the

---

[3] At the hearing, C.B. contended that several years ago, before his parents' separation and divorce, defendant tried to hit him with a car. Defendant denied this contention. The evidence did not substantiate C.B.'s claim or a finding that defendant was trying to hurt his son with a car. Instead, it appears that following an argument at home between father and son, C.B. ran away and defendant followed him in a car. The police were called, and C.B. returned to the house the same evening and thereafter continued living with defendant and plaintiff under the same roof.

[4] Defendant represented that several years ago there was an argument between father and son in their home, which briefly involved wrestling by the living room couch. Clearly, any physical altercation between a father and son of any degree is frowned upon and disapproved. There is insufficient evidence to conclude, however, exactly how and why the altercation began, or that either father or son suffered physical injury during the incident.

[5] On June 29, 2012, DYFS was renamed the Division of Child Protection and Permanency (DCPP). *See L.* 2012, *c.* 16, § 20 (amending *N.J.S.A.* 9:3A–10(b)).

emotional wounds infecting the parent/child relationship were essentially left untreated. Consequently, between 2010 and 2012, defendant and C.B. had no real contact with each other. Meanwhile, neither father nor son undertook any significant initiative to extend an olive branch by forgiving, apologizing for, or otherwise constructively addressing any previous hurtful comments or actions from the past. Instead, both did little besides simmer in a stalemate, silently and unproductively blaming each other for acting disrespectfully and causing the breakdown of the relationship.

Notably, defendant exercised parenting time with the two younger children following the divorce. In fact, the middle child, N.B., briefly stayed with defendant and lived under his roof for a short time before ultimately changing her mind and returning back to plaintiff's care. Moreover, the youngest child, J.B., regularly spent alternating weekends with defendant without any allegations of parental mistreatment.

All three of the children have been successful students. In 2012, C.B. graduated from high school with honors, and was accepted into Rutgers, the State University of New Jersey. The annual estimated cost for C.B. to attend Rutgers was approximately $12,000. A large portion of this cost was anticipated to be covered by available grants, scholarships, and loans.

Regarding any uncovered balance at Rutgers, plaintiff and defendant were unable to reach an agreement in 2012 on what amount, if any, each party should contribute. In particular, defendant objected to contributing anything towards C.B.'s college education, largely because C.B. continued to refuse to have any type of relationship with him. Reciprocally, plaintiff urged that irrespective of the poor relationship between defendant and C.B., defendant should nonetheless still contribute to C.B.'s college costs as he originally committed to do in the settlement agreement. While plaintiff did not initially set forth a request for a specific dollar amount of college contribution, it became apparent during the proceedings that she was seeking a court order requir-

ing defendant to be responsible for a substantial portion of C.B.'s uncovered college expenses.

With the parties at an impasse, post-judgment litigation ensued.[6] Meanwhile, C.B. enrolled at Rutgers, with plaintiff raising approximately $4000 to help pay the uncovered balance of tuition. There was no voluntary contribution at the time from defendant, pending the outcome of the litigation. In the interim, C.B. attended Rutgers as a freshman and did very well in his studies. In the midst of this case, however, C.B. decided that following the conclusion of his freshman year, he wanted to transfer from Rutgers to the University of Miami in Florida. He desired to switch colleges because he was interested in marine biology and, in his view, the University of Miami offered a superior program in this area of study than did Rutgers or other potentially less expensive schools. Unlike Rutgers, which was a state university, the University of Miami was an out-of-state, private institution, which was substantially more expensive than Rutgers. The anticipated annual cost of tuition and related expenses at the University of Miami was approximately $55,000, less $33,000 in estimated financial aid, leaving an estimated uncovered balance of approximately $22,000 per year

Accordingly, in this litigation, plaintiff and C.B. sought contribution from defendant, both for C.B.'s freshman year at Rutgers and for his anticipated sophomore through senior years at University of Miami. In turn, defendant continued to object to paying anything towards C.B.'s tuition, either at Rutgers or the University of Miami. Over the course of several months of pre-trial proceedings, attempts at resolution by mutual settlement proved unsuccessful, and the case ultimately proceeded to a contested plenary hearing.

During C.B.'s freshman year at Rutgers, the court conducted and completed the hearing, in which both parties and C.B. testi-

---

[6] The parties had other post-judgment issues as well which are outside the scope of this opinion.

fied in detail. The evidence established that while plaintiff and C.B. had a close mother/son bond, defendant and C.B. continued to have a very fractured relationship. Both father and son provided subjective, anecdotal testimony and versions of past events and arguments from years earlier. The exact origin of the conflict, however, was never made completely clear. Accordingly, the available evidence did not reflect or support any definitive conclusion as to whether son or father was comparatively more at fault in either initially causing the conflict, or in continuing the ongoing animosities thereafter.

No psychologist was called by either party to testify in the hearing. After observing and listening to both sides testify in court, however, a reasonable layperson could fairly conclude that father and son each have a stubborn streak in their personalities. In this respect, the apple may not have fallen far from the tree. Further, and regardless of how and why the acrimony and hard feelings actually began, one might further reasonably infer that both father and son have each significantly contributed to the perpetuation of the rift due to a commonly shared trait of enormous pride, which is poisoning the parent/child bond and feeding this ongoing family conflict far longer than reasonably necessary or appropriate.

Notwithstanding this history, defendant credibly represents that he still wants to reconcile with C.B. and hopefully move towards a more positive relationship with him. In furtherance of this goal, defendant wishes to initiate the long-deferred father/son joint counseling and reunification therapy. C.B., however, is not nearly as open to the concept of mutually mending fences at this time. Regarding meaningful professional intervention through joint counseling, C.B. is noncommittal and is visibly resistant to the idea of voluntarily attending therapy with his father. Notwithstanding same, however, he simultaneously seeks to have his father help him pay college tuition at Rutgers and thereafter at the University of Miami.

The pressing question before the court is what amount, if any, defendant should pay towards C.B.'s college education under these circumstances. The inquiry involves particular focus on three important legal issues: (1) mandatory parent/child counseling; (2) the relevance and availability of less expensive and more affordable state and private schools, and (3) the existence of younger, teenage children of the parties who may shortly be attending college as well.

## LEGAL ANALYSIS

### Issue 1: Mandatory Parent–Child Counseling

New Jersey law has long held that a divorced parent may be required to contribute towards the cost of a child's college education. *See Newburgh, supra,* 88 *N.J.* 529, 443 *A.*2d 1031; *Colca v. Anson,* 413 *N.J.Super.,* 405, 995 *A.*2d 855 (App.Div.2010); *Zazzo v. Zazzo,* 245 *N.J.Super.* 124, 584 *A.*2d 281 (App.Div.1990). In determining the extent of a parent's obligation to contribute to college costs when the parties have not previously agreed on specific amounts, family courts generally consider the following criteria established by the New Jersey Supreme Court in the landmark case of *Newburgh, supra,* 88 *N.J.* at 545, 443 *A.*2d 1031:

(1) whether the parent, if still living with the child, would have contributed toward the costs of the requested higher education;

(2) the effect of the background, values and goals of the parent on the reasonableness of the expectation of the child for higher education;

(3) the amount of the contribution sought by the child for the cost of higher education;

(4) the ability of the parent to pay that cost;

(5) the relationship of the requested contribution to the kind of school or course of study sought by the child;

(6) the financial resources of both parents;

(7) the commitment to and aptitude of the child for the requested education;

(8) the financial resources of the child, including assets owned individually or held in custodianship or trust;

(9) the ability of the child to earn income during the school year or on vacation;

(10) the availability of financial aid in the form of college grants and loans;

(11) the child's relationship to the paying parent, including mutual affection and shared goals as well as responsiveness to parental advice and guidance; and (12) the relationship of the education requested to any prior training and to the overall long-range goals of the child.

For over thirty years after *Newburgh*, matrimonial litigants and attorneys have battled in court over college contribution issues, frequently and heavily focusing upon factor eleven, the *"child's relationship with the paying parent."* This factor naturally and logically dovetails with the first listed *Newburgh* factor, *"whether the parent, if still living with the child, would have contributed toward the costs of the requested higher education."* The inference connecting these two factors is that hypothetically, if a child were still living in an intact family under one roof and had an ongoing positive relationship with a parent, then that parent would be more likely to contribute some reasonable amount towards the student's college education to the extent financial circumstances so allowed. Conversely, if the parent and child had a broken relationship, or no relationship, then the parent might logically be less inclined to contribute.

In 2006, the New Jersey Supreme Court issued another major opinion on the issue of college contribution. In the case of *Gac v. Gac*, 186 *N.J.* 535, 546, 897 *A.*2d 1018 (2006), the Court stated that "a relationship between a non-custodial parent and a child is not required for the custodial parent or the child to ask the non-custodial parent for financial assistance to defray college expenses." As a consequence of this statement, many litigants interpret *Gac* to hold that the existence of a parent-child relationship is essentially immaterial in a college contribution case. Such an interpretation, however, overgeneralizes *Gac* to a fault, and leads to the erroneous legal conclusion that *Gac* has overruled *Newburgh* on the relevancy of the parent/child relationship.

■ There is nothing in *Gac* which removes the status and health of the parent/child relationship as a factor for judicial consideration. Rather, *Gac* stands for the proposition that the parent-child relationship is not the sole and exclusive factor in the analysis, but rather one of multiple *Newburgh* factors for review.

In other words, while a court may consider the parent/child relationship, there are many other factors to consider as well.

■ For this reason, even if there is no strong parent-child relationship, this does not automatically prevent a court from concluding that a parent should still fairly contribute to college costs based upon other equitable considerations. Theoretically, a court can grant an order under *Gac* for college contribution based upon all of the other *Newburgh* factors and the totality of the circumstances in a given situation, especially if, as in this case, a parent has already generally committed to contribute under the terms of a previously signed settlement agreement.

The fact that a positive parent/child relationship is not an absolute prerequisite for college contribution may be especially significant in a case where the evidence reflects that a child wants a relationship with the non-custodial parent, but reciprocally, it is the parent who does not want a relationship with the child, and who instead has a track record of chronic absenteeism or evasiveness in upholding basic parental responsibilities. For example, if a non-custodial mother or father refuses to see a child for a lengthy time, or willfully and chronically refuses to pay child support which he or she is otherwise able to pay, or intentionally abandons other important child-rearing obligations, then the parent's actions should not somehow serve as an independent basis to defeat a college contribution claim. Otherwise, any parent can unilaterally immunize oneself from college contribution by simply avoiding any relationship or contact at all with a son or daughter, while building a legal argument for a later date that there is no real parent/child relationship under *Newburgh*.

■ In cases where a parent has, through words or actions, intentionally and persistently resisted any active role in a child's life, a court may still equitably compel that parent to contribute to college costs. Such a ruling would be consistent with *Gac*, which permits a court to order college contribution even in the absence of a parent/child relationship. The present case, however, does not factually fit into this example. To the contrary, the evidence

in this matter reflects that while defendant may at times appear overly rigid and inflexible, he is not intentionally evading or avoiding a relationship with C.B. Rather, defendant wants to heal and move forward, and it is not the father but the son who presently poses the greater resistance to potential reunification.

▇ There may be significant support by some parents for the concept that a parent should never have to contribute towards the college expenses of a teenage child who does not have an active relationship with that parent. From an equitable standpoint, however, all cases are fact-sensitive. In some situations, a child may objectively have very legitimate and understandable reasons why he or she does not wish to reunify with a parent. By way of extreme example, if a parent sexually abused the child, the child may justifiably not want any further contact with the parent/perpetrator at all, much less want to sit in the same room with that parent for joint counseling or any other reason.

On the other hand, many parent/child disputes do not involve such horrific circumstances, but rather stem from a host of different situations, disagreements, and arguments which objectively are far less traumatic than sexual assault. In such instances, there is often no clear-cut way to assign fault or identify a sole and exclusive "wrongdoer" between two sides. Particularly when children are teenagers, domestic contretemps often surface as the result of persistent personality clashes, power struggles and battling egos, where parents and children simply get under each other's skin while constantly and chronically pulling at each other in a dysfunctional tug-of-war.

It has long been said that there are at least two sides to every story, and the deterioration of a parent/teenager relationship often involves a multitude of factors beyond a single isolated incident. For example, a parent and child may have conflicting beliefs and perceptions, as well as unrealistic expectations of each other. Moreover, even if one side was hypothetically at fault for saying or doing something which started the breakdown of the relationship, the other side may have an equal or even greater culpability by

fanning the flames for years thereafter, while carrying an endless grudge and refusing to bury the hatchet.

Efforts to legally determine and allocate fault in the breakdown of a family relationship are often exercises in futility. By way of analogy, in divorce litigation, the concept of fault-based divorce has as a practical matter been all but replaced by no-fault litigation and "irreconcilable differences" under *N.J.S.A.* 2A:34–2(a).[7] In this day and age, divorce trials in this state rarely focus upon fault, or who "caused" the divorce. Instead, issues such as child support, alimony, and equitable distribution are regularly addressed and resolved in the context of a no-fault analysis, without requiring the parties to unnecessarily spend time, money, and energy fruitlessly trying to convince the court who was more culpable in ruining the marital relationship.

■ The same challenges in attempting to assign fault in a fractured marriage often exist in a fractured parent-child relationship. This is especially true when the "child" at issue is actually an unemancipated but adult-aged college student with his or her own fully developed, independent mind and value system. In such instance, attempting to calculate who is more at fault may be not only impossible, but pointless in the long run when compared to the far more socially worthwhile goal of attempting reconciliation between parent and child. Thus, the past reasons for a breakdown in a parent/child relationship may not necessarily be the most relevant or productive question for a court undertaking a *Newburgh* analysis. Absent exceptional circumstances such as clear and substantiated abuse, the more important inquiry for the court is not whether parent or child is more at fault for whatever happened in the past, but rather, what parent and child are each now willing to do to heal the relationship in the present?

---

[7] While technically a party can still assert a cause of action for a fault-based divorce on grounds such as adultery, *N.J.S.A.* 2A:34–2(a) or extreme cruelty, *N.J.S.A.* 2A:34–2(c), the overwhelming majority of divorce complaints currently presented to this court are based upon the no-fault grounds of irreconcilable differences.

The concept of looking forward instead of backward, and examining the current willingness of each side to give a damaged parent/child relationship a second chance, is usually far more constructive than an unhealthy and obsessive focus on yesterday. Second chances are critical in life, especially between parent and child. As a lifetime bond, such relationship is generally worthy of all reasonable attempts at improvement, regardless of any past bumps or craters in the road.

Sometimes, a break between parent and child runs so deep that a mutual commitment to joint counseling or therapy is absolutely necessary. In the present case, there was supposed to be such parent-child counseling, which unfortunately never took place. Defendant indicates he still is willing to attend counseling with his son. The question, however, is whether C.B. is willing to try as well.

At the time of divorce, defendant committed to contribute to C.B.'s college education without any express conditions in the settlement agreement. Therefore, the court could theoretically hold defendant to the strict letter of his prior agreement. From an equitable standpoint, it is not necessarily appropriate to automatically punish C.B. and potentially deny him funds to attend college because of a prior breakdown in the parent/child relationship which (a) may not have been entirely his fault, and (b) may have been perpetuated by decisions C.B. made while still a juvenile, i.e., the choice to stop communicating with his father. While there may certainly be cases where a teenager's actions towards a parent are so fundamentally and continuously inappropriate and outrageous that it is inequitable to require the parent to contribute towards that child's college tuition, the past conduct of C.B. in this case does not necessarily rise to such a level. Rather, as a high school teenager he clearly was upset with his father as a result of unresolved past issues, and passively chose not to interact with him following his parents' separation. Sometimes, a child or teenager simply may not have the maturity level or life experience to make important decisions based upon logic instead

of impulse. As a result, a juvenile might react to emotional family events, including but not limited to parental separation and divorce, in a manner much differently than he or she might have reacted as a time-tested adult.

C.B., however, is no longer a juvenile. While he is a full-time college student and technically unemancipated, he is also a man. As a legal adult, he may be held to a far different level of maturity, responsibility, and accountability for his current choices and actions, including any decision to continue giving his father the never-ending silent treatment. If an adult "child" refuses to have a relationship with a parent without a clear showing of exceptional circumstances, and if that child further refuses to participate in trying to heal the relationship, such as by joining the parent in professional counseling, then the child's message rings loud and clear that from his or her own subjective perspective, the parent/child relationship no longer has any value.

■ When an adult child takes this type of dismissive attitude towards the parent/child relationship. and instead continues to harbor endless resentment towards the parent with no good faith effort at rehabilitation or reconciliation, then the idea of the child simultaneously demanding college contribution from the parent may be viewed by a court of equity as fundamentally unfair and inequitable to the parent, even after considering all of the other applicable criteria under *Newburgh*. Further, a student's rejection of the opportunity to attempt reunification with a parent may be factually so compelling as to equitably overshadow and eclipse the other *Newburgh* factors, and tilt the scales of justice in favor of suspending or completely terminating the parent's obligation to financially contribute towards the child's college education.

A student may academically be very smart and successful, or even an intellectual genius. However, there are many important lessons to learn in life outside the classroom, such as forgiveness, tolerance, the value of family ties, and the importance of demonstrating thankfulness and gratitude for a parent's assistance. In the present case, while the court cannot and will not physically

force C.B. into joint father/son counseling, the court can certainly consider any continued refusal by C.B. to attend such counseling as material in whether there should be any ongoing college contribution by defendant at all. A parent-child relationship must be a two-way street, especially when the child is seeking a parent's ongoing financial assistance. While defendant did previously agree in the divorce settlement to help pay for C.B.'s college costs, that agreement never stated that the college contribution clause was permanently non-modifiable, or that defendant would be absolutely forced to pay even if his son refused to talk with him ever again and then stuck with that position for three long years thereafter. To the contrary, the divorce agreement expressly contemplated parent/child counseling, and further implicitly contemplated a mutual, good-faith attempt by both father and son to work on healing and saving their relationship.

Accordingly, while the court will at this time enforce defendant's prior agreement to financially contribute to C.B.'s college tuition costs, such obligation will be expressly contingent upon C.B.'s reciprocal obligation to actively commence and attend at least five joint parent/child counseling sessions with his father. The five sessions are a minimum and not a maximum number, and the court may in its discretion order additional counseling sessions upon further application as well. This order is in direct step with the public policy of *Newburgh,* which directs trial courts to consider the child's relationship with the parent. The "relationship" includes not only the past relationship when the child was much younger, but more importantly, the present, ongoing relationship, including any and all active attempts to productively address ongoing issues.

The court orders that C.B. will participate in all of the five minimum sessions with his father prior to the start of the next college semester. If he refuses or fails to do so, defendant may make further application to suspend or terminate his obligation to

contribute to C.B.'s college tuition.[8]

*Issue 2: Less Costly Tuition at Other State or Private Colleges*

■ In addition to the foregoing, there is another important legal issue in this case. Specifically, the court finds that a relevant factor for consideration is the potential availability of colleges and universities which are significantly less expensive, and thus more reasonably affordable for some parents, than a student's school of "top choice." The case of *Finger v. Zenn*, 335 *N.J.Super.* 438, 762 *A.2d* 702 (App.Div.2000), *certif. denied* 167 *N.J.* 633, 772 *A.2d* 935 (2001) does not hold to the contrary.

In *Finger, supra*, 335 *N.J.Super.* at 444–45, 762 *A.2d* 702, the Appellate Division rejected the prior reported opinion of *Nebel v. Nebel*, 99 *N.J.Super.* 256, 239 *A.2d* 266 (Ch.Div.), *aff'd*, 103 *N.J.Super.* 216, 247 *A.2d* 27 (App.Div.1968), and the so-called "Rutgers Rule" which limited a parent's mandatory college contribution to the amount which otherwise would have been required to send the student to a state university such as Rutgers. Specifically, in *Finger* the court stated the following:

> Defendant further relies on *Nebel v. Nebel*, 99 *N.J.Super.* 256 [239 *A.2d* 266] (Ch.Div.), *aff'd*, 103 *N.J.Super.* 216 [247 *A.2d* 27] (App.Div.1968) for the proposition that he cannot be compelled to pay more than the annual cost at Rutgers since his son could have received a quality education at that state university. In *Nebel* the Chancery judge held that a divorced father could be required to contribute to the college education of his son but limited the required contribution to the approximate cost of Rutgers.... (T)o the extent that *Nebel* is read to hold that there is a ceiling on a college contribution by a divorced spouse to the cost of a state university at any public or private college, it is specifically disapproved.
> [*Id.* at 444–45, 762 *A.2d* 702.]

Some litigants have subsequently construed *Finger* to mean that when a student seeks to attend a private university, the comparative cost of tuition at Rutgers or another less expensive

---

[8] The court makes no advance rulings as to what might occur in the event the counseling sessions conclude and there is a disagreement between parent and child as to whether the counseling was helpful, and/or if further counseling should occur. Any such potential future issues are speculative. If any such issues do arise in the future which cannot be resolved consensually, further application may be made in accordance with the Court Rules.

state college is, as a matter of law, immaterial to the analysis. Such an interpretation, however, misses the mark. What *Finger* stands for is the legal proposition that the family court is not *prohibited* from ordering a non-custodial parent to financially contribute to a child's college costs in an amount exceeding the cost of attendance at a state college. For example, if a college-age child attends a private university with an annual tuition of $20,000, and the comparative cost of tuition at a state university such as Rutgers is only $12,000, the court may in some cases require a parent to contribute in excess of $12,000, i.e., a sum greater than the amount he or she would have paid had the student attended the state college.

What *Finger* does not stand for, however is the opposite concept, i.e., that a court is prohibited in every case from ever considering the availability of other state colleges and private colleges, at substantially reduced tuition, as relevant and material in the search for an equitable resolution. Rather, a fact-sensitive analysis is necessary on a case-by-case basis. In analyzing the reasonableness of the amount of financial contribution sought from a parent for college education, the existence of less expensive and more affordable college alternatives is, in fact, a logical, fair, and equitable consideration under the totality of a family's economic circumstances.

Nowhere has New Jersey's law of college contribution been interpreted to mean that a child has the automatic right to select any college he or she wants, regardless of price or affordability, and then require the parents to pay the uncovered balance of tuition. Even when, as in this case, parents have previously stipulated to contribute to a child's college tuition, there must logically be consideration of all potential options, including schools which are potentially less expensive and more reasonably affordable beyond the child's school of first choice.

In intact families, where mothers and fathers address such issues outside of divorce court, the comparative expenses and affordability of tuition at different colleges is usually a significant

factor for consideration by financially responsible parents and students alike. The issue of cost is no less important in families of divorce, particularly in cases where neither parent can afford a blank checkbook approach to education. Further, the relevance of the issue clearly dovetails with three other express *Newburgh factors:* factor three ("the amount of the contribution sought by the child for the cost of higher education"), factor four ("the ability of the parent to pay that cost"), and factor six ("the financial resources of both parents").

These points lead to a material and paramount point in a family court's analysis of a college contribution case: Regardless of what school a student personally wishes to attend, no parent should be expected to contribute more than he or she can reasonably afford. For example. if a parent earns a relatively modest income and can only afford to contribute a maximum of $3500 per year towards college tuition, this financial limitation logically stays the same regardless of whether the student wants to go to a college which costs $3500 per year or $35,000 per year. The fact that a student desires to go to a much more expensive school does not somehow increase the parent's financial ability to pay. In such circumstance, if the student cannot otherwise raise the additional money to attend the more expensive school through loans, grants, scholarships, savings, income, or other resources, then the student simply cannot attend that particular college, period. This is exactly the reason why the possibility of less costly and more reasonably affordable schools remains a relevant and logical piece of the puzzle in sensible college planning, and in family court litigation as well.

■ Facts, not principles of law, decide cases. *Bendix Corp. v. Dir., Div. of Taxation,* 125 *N.J.* 20, 41, 592 *A.*2d 536 (1991). In *Finger, supra,* 335 *N.J.Super.* at 442, 762 *A.*2d 702, the court rejected the father's argument that his financial contribution to his son's college tuition must legally be limited to the cost of a state university (Rutgers), even though the child wished to attend, and did attend, George Washington University, a private institution.

In denying the father's contention, the *Finger* court noted that there was a very substantial difference in cost of tuition between Rutgers (then approximately $12,000 per year) and George Washington University (then approximately $31,000 per year). Notwithstanding the financial disparity, however, there was "no real issue as to the parties' financial ability to contribute," to the higher tuition at George Washington University. *Id.* at 442, 762 A.2d 702. The father was a financially successful dentist with very substantial income, assets, and investments, and the mother had access to significant funds as well. Further, the *Finger* court found that not only had the father attended an expensive private university for his own college education (New York University), but very significantly, he had actively encouraged his son to apply to other expensive private universities as well. *Id.* at 441, 762 A.2d 702. Accordingly, the court ordered the father to contribute to the son's college education in excess of what his contribution would have been had the son attended a state university, but expressly rendered its verdict and analysis "under the factual circumstances of this case." *Id.* at 440, 762 A.2d 702.

As the parties in the present case can certainly verify, however, not every litigant in family court has the same level of wealth and financial resources as the parents in *Finger*. Economically speaking, parental duty can only go so far. If a particular parent voluntarily chooses to incur a self-imposed and severe financial hardship by trying to fund college tuition outside of his or her own reasonable budget, then that is the parent's own decision. When dealing with concepts such as mandatory payments and court orders, however, not even the most loving and dedicated parent should be compelled to take a vow of poverty for the benefit of a collegiate son or daughter. A mother or father should not be required to involuntarily sell a primary home, mortgage all equity, zero out all retirement plans, gut all savings, stack multiple exorbitant loans on top of each other, or bankrupt oneself in order to send a child to an unaffordable college of first choice.

As noted by the *Finger* court itself, family finances may often limit college options or in some cases even make college an unfulfilled wish. *Id.* at 445, 762 *A.*2d 702. In the present case, the simple fact is that even after consideration of available student loans, grants and scholarships, the parties have insufficient income and assets to send C.B. to University of Miami on their own. While it is true that both parties' incomes have recently and significantly increased since the time of the divorce agreement, they still cannot afford to fund uncovered tuition of $22,000 per year, even if both parties hypothetically wanted to pay this amount. Unlike the situation in *Finger*, neither parent in this case is a wealthy, high-earning professional with very significant income and assets.

In their 2010 settlement agreement, the parties expressly and voluntarily agreed to contribute to the children's college tuition in accordance with what their financial capacities, which in this case is substantially less than the uncovered annual tuition at the University of Miami. What the parents can reasonably manage, however, is joint contribution of some far lesser, limited, combined amount of money to help subsidize C.B.'s college costs at a school he can afford.

### Issue 3: Younger Siblings Relatively Close in Age

In considering how much money a parent may contribute to a child's college education, there is an additional factor which was not expressly addressed by the *Newburgh* court, but which is material in the case at bar: Specifically, when there are other, younger children in the family, who are good students and who are relatively close in age to an older, college-age sibling, this can be a relevant factor in determining how much money the parents should apply towards the oldest child's college education.

In intact families where there are multiple children, many frugal and responsible parents understand and appreciate the financial importance of developing a reasonable, long-term strategy to potentially help all of their children attend college, rather than just the oldest child. Some parents set up modest college savings

plans, such as 529 plans or other similar economic devices, and in disciplined fashion put aside relatively small but affordable amounts of money each week or month as a consistent part of the budget, allocated in equal or similarly measured amounts among all the children. In this fashion, each child is treated equitably by the parents in terms of basic college planning. For example, if parents have $20,000 in extra funds to contribute to a college fund, and they have four children, they may divide these funds at $5000 per child, rather than paying the entire $20,000 toward the first child's tuition and having nothing left over to help the younger children.

This example helps underscore the economic reality that when parents save nothing for college until their oldest child's senior year of high school, and then at the last minute hurriedly pull from all available economic resources such as surplus income, assets, and loan capacities solely to help fund their first child's education, they may in fact be potentially sacrificing the educational opportunities of the younger children solely for the sake of the oldest child. Further, a family court order which essentially requires parents to exhaust all reasonably available funding resources on the oldest child's tuition may be causing a significant inequity and disservice to the younger children in the collegiate pipeline. The rights of all the children, and not simply the oldest child, may be considered by a court of equity exercising *parens patriae* jurisdiction over the children's best interests. Such analysis logically includes consideration of not only the oldest child's present needs, but the younger children's likely future needs as part of a full and thorough analysis of the family's circumstances.

Historically, the tradition of legally favoring and prioritizing the financial rights of the oldest sibling to the detriment of the younger siblings was known as primogeniture,[9] a social and legal concept which was ultimately rejected and abolished by this country in its colonial infancy over 200 years ago. Under primo-

---

[9] *See Black's Law Dictionary* 1230 (8th ed.2004).

geniture, the oldest male child generally inherited the family estate based solely on order of birth, to the detriment of the younger siblings. This policy had entrenched roots in England, but was never embraced as appropriate in the United States of America, and beginning with Georgia in 1777, was ultimately abolished on a state-by-state basis shortly after the nation's formation.[10]

In the present case, C.B. has two younger siblings, N.B. and J.B., who are relatively close in age, and who like their older brother are also academically successful. Also like their older brother, these children were intended beneficiaries of their parents' 2010 divorce settlement agreement, wherein both plaintiff and defendant agreed to financially help all of their children attend college. During the present court hearing, however, the primary focus of both plaintiff and defendant centered only on their dispute over funding college tuition for the oldest child, C.B. This development was somewhat predictable, since C.B. was the only child who presently had college bills needing to be addressed. The problem, however, was that while neither plaintiff or C.B. expressly wanted or asked for money to be taken from the younger siblings to pay for C.B.'s college education, the net effect could have been exactly that unless the court also gave due consideration to the other children's potential future college costs as well.

The concept of equitably considering the impact of a compulsory financial obligation towards one child on the rights of other

---

[10] See http://www.history.com/this-day-in-history/georgia-constituton-abolishes-primogeniture-and-entail (last visited June 26, 2013). The British colonies in North America, and particularly the southern colonies, were known as a haven for younger sons of the British gentry. Most famously, Benjamin Franklin announced in his autobiography that he was the youngest son of the youngest son for five generations back. Moving to the colonies was an attractive option for younger sons like Franklin because younger sons could take their monetary inheritance and build up their own estates here, whereas primogeniture and entail prevented them from inheriting similar estates in the mother country.

children is not foreign to family courts in this state. By way of analogy, New Jersey amended its child support guidelines to potentially reduce the amount of support a noncustodial parent has to pay for one child when he or she subsequently has afterborn, dependent children from new relationships. The guidelines now expressly include a mechanism of apportioning a parent's income among all of his or her legal dependents regardless of the timing of birth or family association. Thus, if a divorced parent remarries and has children, that parent's income is equitably shared by all children born to that parent. *Child Support Guidelines,* Pressler & Verneiro, *Current N.J. Court Rules,* Appendix IX–A to *R.* 5:6A at 2549, note 10a and Appendix IX–B, Line 2d (Other Dependent Deduction) at 2574 (2013). Accordingly, as a matter of public policy, the rights of a party's younger child to support should not be subordinated to the rights of an older child merely because of the fortuitous circumstance of which child was born first.

Equitably, a similar philosophy may apply to the related issue of college contribution. Our courts have previously recognized that the support needs of a child may include the responsibility of providing a proper education. *See Grotsky v. Grotsky,* 58 *N.J.* 354, 356–57, 277 *A.*2d 535 (1971); *Martinetti v. Hickman,* 261 *N.J.Super.* 508, 512, 619 *A.*2d 599 (App.Div.1993). Therefore, a court which undertakes a college contribution analysis under *Newburgh* may appropriately consider, as a specific component of the equation, the need for a reasonable and fairly balanced plan addressing all the children's educational needs instead of just those of the oldest child, especially if, as in this case, the younger children are all teenagers and the issue of college tuition is likely to resurface before the court in relatively short order.

While the relationship between college tuition costs and younger siblings has rarely been addressed in prior New Jersey case law, there is at least one reported opinion where a court indirectly discussed the issue in dicta. In *Enrico v. Goldsmith,* 237 *N.J.Su-*

*per.* 572, 577, 568 *A.*2d 576 (App.Div.1990), the court noted the following:

> We are concerned because the record discloses that there is another daughter who, we must assume, also aspires to attend college. The age differential is such that both children may well be in college at the same time. The present order, and the record, does little to evaluate that possibility, or to formulate an orderly plan in the best interests of both children and the parties. Although the order may appear superficially to deal only with Randi's college needs, we observe that most families in our present society necessarily regard college expenses as something to be budgeted and paid for as part of a long-term scheme involving the judicious use and application of earnings and assets before, during, and sometimes after the period of education. Education is, in effect, a capital investment.

The court finds the logic of *Enrico* to be relevant, logical, persuasive, and applicable in the present case. In analyzing the resources of the parents and the amount they can pay or set aside for C.B.'s education under the terms of their prior settlement agreement, it is fair and appropriate to consider the probability that these parents will likely need to spread available funds between three children's collegiate needs, across an approximate eight-year period of time during which all three children will likely be attending college at different times.

## CONCLUSION: PARENTAL CONTRIBUTION

In reviewing the totality of the testimony and evidence supplied at the plenary hearing, the court finds that parties have the reasonable ability to contribute a limited, combined total of $7500 per year, allocated between three college savings plans to be established and specifically earmarked for all three children's potential college costs. The respective contributions will be $3375 per year in total from plaintiff (paid at $282 per month or $65 per week), and $4125 per year in total from defendant (paid at $343 per month or $79 per week), for eight years (ninety-six months). This money may be funded either from income (including in plaintiff's case, her ongoing alimony entitlement), assets, or any other resource in each party's own discretion, including small and manageable parent loans. Plaintiff's payments constitute 45% of the total annual contribution, while defendant's payments com-

prise 55% of same. The ninety-six month period constitutes eight years during which all of the children are reasonably anticipated to attend college at one time or another. With the parties contributing a combined total of $7500 per year, these monies will be equitably amortized between the children as set forth in the chart below so that the aggregate parental contribution totals $60,000 ($7500 × eight years), or a combined total of $20,000 towards each child's college education, spread out over an economically affordable period of time.

While these funds clearly may not be enough to pay the full tuition for any of the children's education, the amounts nonetheless constitute financially fair and reasonable assistance by both parents to help subsidize each of the children's college expenses. given their respective economic limitations. Further, if a child attends a school which happens to cost less than $20,000 for a four year degree, the parents may be entitled to a refund or reallocation of any unused funds after graduation.

As per the attached chart, each party will pay a fixed monthly payment, to be allocated and made available for each of the children towards attainment of a college degree. The chart reflects how the monthly payments will be allocated in different amounts at different times between the three accounts so that each child will individually and over time have the potential availability of $20,000 in parental assistance towards ongoing college costs. The creation of such educational funds for the children is legislatively authorized by *N.J.S.A.* 2A:34–23, which provides that after entry of a judgment of divorce, the family court may create "trusts or other security devices, to assure payment of reasonably foreseeable medical and educational expenses."

There are practical benefits for this type of systematic and manageable college savings program between divorced parents, who have previously agreed to assist their children. First, the attached schedule reflects that plaintiff and defendant will be paying a fixed amount each per month, regardless of how many children are actually attending college at the same time. Thus,

each party will know what their exact obligation is and how much he or she pays on a monthly basis, similar to a mortgage or car payment, with such consistent monthly payments implemented into a steady budget for planning purposes. This makes matters financially predictable for both parents, so neither has the daunting task of suddenly and unexpectedly having to come up with thousands of dollars at one time, such as right before the start of a college semester.

Second, the children are at the start treated relatively equally, with equal opportunities from the start to receive similar contributions from their parents.[11] Third, the children know exactly what amounts will be available through parental contribution, so that they can plan accordingly and calculate how much additional money will be necessary to raise to attend certain colleges. If there are insufficient funds from grants, loans, and parental contributions, and if they cannot otherwise raise the funds, then they will need to change their plans set their sights on other more affordable schools.

Fourth, and perhaps most significantly, is the likelihood that this system will mitigate against the need for return trips to court, year after year, every time a new child starts college. If the court deals only with the limited issue of college expenses for the oldest child, C.B., then it is safe to predict that as soon as the middle child, N.B., becomes college eligible in the very near future, the parties will be right back litigating over how much money each has to pay towards their daughter's tuition, as well as whether funds

---

[11] As with base child support, however, college contribution is always subject to modification when there is a substantial change of financial circumstances. Accordingly, while parents may start off saving equally for all of their children's college education, it is always possible that due to a future substantial change in financial circumstances either upward or downward, contributions may change and the younger children may receive more or less economic support from either or both parents than did an older sibling. While no court can predict the future, this plan at the very least treats all unemancipated children similarly at the start, subject to any modifications which may be equitably necessary in the future.

will then have to be taken from C.B.'s prior allotment in order to help pay for the younger sister's college expenses.

Of course, there is no absolute guarantee what the future may bring. Some children may either never go to college, or only go to college following emancipating events such as marriage, military enrollment, or moving out of the parents' home and emancipating themselves. Others may earn substantial or even full scholarships, thereby obviating the need for any significant parental contribution toward tuition at all. Additionally, a parent's financial circumstances may substantially change for better or worse, thereby resulting in applications to modify the schedule regarding college contribution for younger and still-unemancipated children.

Notwithstanding these possibilities, however, the development of a present schedule for gradually accumulating reasonable savings to utilize toward the children's college expenses, if and when necessary, makes practical economic sense. In this case, given the parties' express prior agreement to each contribute towards such costs, it is logical to implement a joint savings program which fairly accounts for the number of children at issue and the parties' reasonable ability to pay.

If future events reflect that a child is not attending college, or that there is any other legitimate reason that college contribution should not be required (including, as previously referenced, a student's refusal to communicate with a paying parent), either party may file further application for suspension, modification or possible termination of the college contribution obligation, and a potential refund of unused funds or equitable reallocation of such funds among the remaining children's college costs.

The three accounts shall be established within thirty-five days. Each party shall thereafter tender his or her monthly contribution under the schedule via electronic direct deposit into the applicable account(s) by the fifth day of each month, commencing August 1, 2013, for ninety-six months, unless and until further court order or joint agreement of the parties. For clarity of bookkeeping pur-

poses, no other funds should be co-mingled in any of these college accounts.

If the oldest child, C.B., transfers to the University of Miami, then it is his own obligation to secure the remaining funds above and beyond the limitations of his parents' mandatory contributions to pay for tuition, room and board, meal plans, and other ancillary collegiate expenses. If C.B. cannot raise or secure these remaining funds elsewhere, then he may not be attending the University of Miami. He can, however, apply the parental contribution towards continued tuition at Rutgers, or at any other college which he can otherwise afford to attend.

Further, if C.B. does raise the funds to attend the University of Miami, he can utilize the parental contribution as a subsidy toward the cost of his education there. The existence of Rutgers as a continuing option, however, clearly remains viable as an affordable university where C.B. has already established success as a freshman. In other words, C.B. will not be denied a reasonable college education even if he stays within the conservative parameters of his parents' budgets.

This matter is hereby concluded, with the parties to follow the payment schedule set forth below unless and until further order of the court.[12]

---

[12] Subsequent to the court's decision in this matter on June 26, 2013, there were extensive post-order proceedings on various issues. Ultimately, the post-order proceedings concluded on February 24, 2014, with the parties entering into a consent order for college contribution which slightly modified the arrangements set forth herein.