NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1832-14T1
            A-2409-14T1

MAURA RICCI, n/k/a MAURA MCGARVEY,

     Plaintiff-Appellant/
     Cross-Respondent,

v.

MICHAEL RICCI,

     Defendant-Respondent,

and

CAITLYN RICCI,

     Intervenor-Respondent/
     Cross-Appellant.

_____

MAURA RICCI, n/k/a MAURA MCGARVEY

     Plaintiff-Respondent,

v.

MICHAEL RICCI,

     Defendant-Appellant,

and

CAITLYN RICCI,

     Intervener-Respondent.

_____

| **APPROVED FOR PUBLICATION** |
| :---: |
| **February 9, 2017** |
| **APPELLATE DIVISION** |

Submitted November 3, 2016 – Decided February 9, 2017

Before Judges Lihotz, Hoffman and Whipple.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FM-04-0239-98.

Petersen & Martone, attorneys for appellant/cross-respondent (Kelli M. Martone, on the briefs).

Morgenstern & Rochester, LLP, attorneys for respondent/cross-appellant (Andrew L. Rochester, on the brief).

Smithbridge, LLP, attorneys for appellant Michael Ricci in A-2409-14, join in the brief of appellant/cross-respondent Maura Ricci in A-1832-14.

The opinion of the court was delivered by

LIHOTZ, P.J.A.D.

More than thirty years have passed since the Supreme Court issued Newburgh v. Arrigo, 88 N.J. 529 (1982), which held "the privilege of parenthood carries with it the duty to assure a necessary education for children." Id. at 543. Necessary support for unemancipated children could include contribution toward the cost of a college education, even though the child has attained the age of majority. Id. at 543. Since then, courts have struggled to define the scope of this parental obligation, as circumscribed by facts and circumstances unique to each family. In this case, we examine the court's role in navigating the interplay between emancipation and a parent's

obligation to provide for a child's support in the form of college tuition, when the child has left the parent's home.

Plaintiff Maura McGarvey appeals from several Family Part orders mandating she and defendant Michael Ricci, plaintiff's former husband, contribute to the college tuition expenses of intervenor, their now twenty-three-year-old daughter, Caitlyn Ricci. Plaintiff and defendant agreed Caitlyn was emancipated when she left her mother's home to reside with her grandparents at age nineteen. Plaintiff and defendant filed a consent order terminating child support. Thereafter, Caitlyn moved to intervene in the matrimonial matter, seeking to vacate the emancipation order and require her parents to provide funds allowing her to attend college. In the October 11, 2013 order, the judge permitted Caitlyn to intervene and required plaintiff and defendant to pay the tuition cost for Gloucester County Community College (the community college), which was less than $2,000.

Prior to completing her associate's degree, Caitlyn transferred to Temple University, in Philadelphia, Pennsylvania (the university). She moved for plaintiff and defendant to pay annual tuition for the university, which, after awarded financial aid, was significantly more than the tuition at the community college. On October 31, 2014, a newly assigned judge

considered Caitlyn's motion. He concluded the issue was adjudicated and governed by the October 11, 2013 order. Accordingly, without benefit of a plenary hearing or review of financial documentation, the newly assigned judge "enforced" the October 11 order and required plaintiff and defendant satisfy the university's outstanding tuition, fees, and the cost of books.

Plaintiff and defendant sought reconsideration and were assigned to return to the initial motion judge. Unfortunately, he limited his review to the provisions of the first order, not the October 31, 2014 order. Thus, the judge declined to examine whether and to what extent plaintiff and defendant could and should pay tuition to the university. He noted Caitlyn did not discuss attending the university in her October 2013 motion, revealing only plans to attend a state university once she earned her associate's degree. In the December 6, 2014 order, the judge considered the factors identified in Newburgh, as to the request plaintiff and defendant satisfy community college tuition. There was no discussion regarding payment for the university. In that regard, the judge declined to reconsider the order to pay the university tuition set forth in the October 31, 2014 order.

Plaintiff appeals from the October 11, 2013, October 31, 2014 and December 6, 2014 orders. Defendant also appeals from these orders. The matters were consolidated and we granted defendant's motion to join in and rely on the brief submitted by plaintiff. Caitlyn filed a cross-appeal, challenging plaintiff's attack on the October 11, 2013 order and argued the denial of her request for attorney's fees in the October 31, 2014 and December 6, 2014 orders was error.

Following our review, we conclude the judge properly allowed Caitlyn to intervene in this action to advance her request for support. However, the record is void of the basis establishing Caitlyn was unemancipated at the time of the October 11, 2013 review. As more thoroughly discussed in our opinion, emancipation is a legal determination, which must be resolved prior to awarding support, including payment of college costs. Because this analysis is absent, we reverse and vacate the provisions of the challenged order addressed to emancipation and payment of support. We remand this matter for plenary review.

I.

These facts are found in the record. Plaintiff and defendant were divorced when Caitlyn was four years old. Plaintiff was the parent of primary residence, defendant

exercised regular parenting time and provided child support. The record reflects the parents shared decision-making responsibility regarding Caitlyn's care.

Caitlyn graduated from high school in June 2012. Various actions resulted in the conclusion Caitlyn was not ready to live away at college. With her parents' urging and support, Caitlyn enrolled part-time in the community college. However, estrangement with her parents heightened, and Caitlyn left her mother's home in February 2013, to reside with her paternal grandparents. Plaintiff and defendant agreed Caitlyn was emancipated. This decision was memorialized in a March 30, 2013 consent order terminating defendant's obligation to pay child support.

Legal action followed as Caitlyn moved to intervene in her parents' dissolution action. She sought to vacate the March 30, 2013 order of emancipation, compel payment of her full-time community college education costs, provide financial assistance to acquire a new car, continue her health insurance coverage, and pay counsel fees and costs. Plaintiff and defendant objected to the relief Caitlyn requested. Specifically, both parents challenged Caitlyn's request to intervene and asserted her conduct demonstrated her desire to be independent of parental control, which obviated any obligation for support.

In an accompanying certification, Caitlyn briefly mentions the family dynamics, stating, "substantial personal problems . . . necessitated that I move out of my mother's home . . . . I did not fit in well with her new family." She also stated "I . . . had substantial problems with my father's new family[,] and thus he was not an option."

Plaintiff and defendant's pleadings cast a different light on the parent-child relationship. Both parents expressed their love for Caitlyn and a willingness to address issues as a family; however, plaintiff and defendant separately opposed Caitlyn's motion based on her conduct and choices. Their certifications detail the difficulties experienced with Caitlyn's dangerous decisions and disobedience, which started while she was in high school. Caitlyn's conduct included smoking marijuana while driving, engaging in underage drinking and sexual activity, participating in explicit sexual conversations on the internet, and attempting to hurt herself.

Plaintiff explained she attempted to counsel her daughter, who nevertheless did not obey her requests, expressed dislike for imposed rules, and chose to leave her home. Plaintiff asserted Caitlyn "willingly, knowingly, [and] voluntarily left and went [out] on her own."

Defendant discussed his view of Caitlyn's trouble with alcohol, drugs, and impulsive behavior, as well as her acts of opposition to plaintiff's imposition of discipline, including a curfew and the obligation to perform household chores. Defendant related his efforts to discuss these concerns with Caitlyn, which she repeatedly rebuffed. He stated Caitlyn refused to answer her parents' texts or calls prior to filing her motion. Caitlyn had not spoken to either parent for six months; she ignored birthdays, a family member's illness, and mother and father's day. Finally, defendant pointedly objected to Caitlyn's decision to reside with his parents, showing unequivocally he was estranged from them and blamed them for exacerbating parental relationship difficulties with Caitlyn.

The record also informed regarding Caitlyn's college decisions. These facts are undisputed. When she was accepted to attend Montclair State University, plaintiff and defendant discussed contributing $5,000 each towards annual college costs, with the remainder satisfied by Caitlyn obtaining student loans. However, because of Caitlyn's behavior, it was agreed she was not ready to live away from home, and should first attend community college. Defendant paid the summer and fall 2012 community college tuition, and Caitlyn attended part-time. In the winter of 2012, Caitlyn sought to attend the Disney College

program in Florida. Plaintiff and defendant jointly agreed to support Caitlyn's effort as a way of testing her readiness to live on her own. They fully paid for her participation and assisted her move to Florida. Unfortunately, within a month of arriving, Caitlyn was expelled for underage alcohol use as the host of a party in the dorms.

The parties disagreed on events occurring after Caitlyn returned from Florida. Plaintiff and defendant wanted Caitlyn to return to community college to compete her associate's degree. With defendant's support, plaintiff outlined a course of discipline, work, and community college courses demanded of her daughter. Plaintiff recounted how Caitlyn rejected these attempts to restore discipline and make-up missed college credits, stating she wanted instead to spend the summer with friends. Plaintiff asserted Caitlyn indulged in what she labeled frivolous spending, inappropriate use of Facebook, and multiple nights spent away from home. Plaintiff initiated counselling, but Caitlyn attended only one session and refused to continue. Caitlyn then decided to move to her grandparents' home where she was not restricted.

Caitlyn's version expressed a different story. Caitlyn maintained she did not "run to her grandparents in defiance"; rather, plaintiff "kicked [her] out" when she returned from

A-1832-14T1

Disney.    Alternatively, Caitlyn attributed the move to her grandparents as her parents' "suggestion."    Further, she characterized the behavior outlined by her parents as "things that teenagers typically do" and insisted the control exerted by her parents' demands was "impossible."  Caitlyn asserted she was following the college path her parents dictated and accepted all conditions imposed, except the demand to work full-time and take three summer classes.    She insisted the imposed unrealistic demands pushed her beyond the sphere of parental influence.

Caitlyn initiated litigation only after plaintiff and defendant separately informed her they would not pay her community college costs because she was not residing with either of them.    Caitlyn asserted she was a full-time community college student and, upon completion of her associate's degree, planned to attend Rowan University.  Pay stubs reflected Caitlyn grossed more than $400 per week waitressing.

During oral argument, in response to plaintiff's suggested request for a plenary hearing to determine whether Caitlyn was unemancipated, the Family Part judge stated:

> Well, there may be a time in a future year that you need a plenary hearing, but based on the cost of the college for this year, I really think that would be overkill and I feel that the [c]ourt would have enough based upon the excellent briefs and the certifications that were submitted that I could make a decision today.

Defendant's counsel asked whether the order was intended to address just the current community college tuition request or possible future costs at a four-year school. The judge answered "I don't think I can do that."

The judge granted Caitlyn's motion to intervene. Describing the matter as a "unique situation," he deemed Caitlyn "un-emancipated [sic] solely for the purpose of a potential contribution from [her parents] as it relates to college costs." In rendering his order, the judge rendered his order, stating he sought "to make the best economic decision[,]" and limited the order's provisions to payment of community college costs for the 2013-2014 school year. He ordered Caitlyn to seek and apply for loans and scholarships to reduce expenses. Caitlyn represented she had done so and was awarded $2,500. Noting financial information was not in the record, the judge stated plaintiff and defendant were to split remaining "costs related to . . . tuition, fees and books."

Also, the order stated:

> 4. For subsequent school years, before determining . . . [p]laintiff and [d]efendant's contribution to Caitlyn's tuition, fees and book costs, Caitlyn shall apply for all eligible loans and apply all eligible scholarships toward her tuition, fees, and book[] costs.

5. On future matriculation (beginning the [f]all of 2014), the [p]laintiff and [d]efendant shall exchange tax returns and the three (3) most recent paystubs in regards to determining a child support percentage for each party. This child support percentage breakdown will determine the amount that the parties will pay towards Caitlyn's college tuition and books[,] after Caitlyn has obtained all financial aid, grants, and scholarships.

. . . .

9. For future academic years, all parties will attend economic mediation if they cannot agree to Caitlyn's college tuition, fees, and books.

The order denied Caitlyn's request for contribution toward the purchase of a new car and found plaintiff always maintained health insurance coverage for Caitlyn, making the request moot. Finally, "in a compensatory manner," the judge awarded Caitlyn $1,000 in counsel fees and costs, payable $500 by each parent, which "shall come off the parties' contribution towards Caitlyn's college costs for tuition, fees and books for the 2013-[20]14 academic year."

Caitlyn was accepted to attend the university, commencing in the fall 2014. She notified plaintiff she was leaving community college and requested plaintiff complete the Free Application for Federal Student Aid (FAFSA). Plaintiff agreed to do so but suggested Caitlyn first obtain her associate's

12

degree, noting she and defendant could not afford the university's tuition cost.

Caitlyn filed a motion to enforce litigant's rights, seeking an order compelling plaintiff and defendant to attend economic mediation to fix their respective contributions toward the university's tuition, fee and book costs and to reimburse past community college costs.

Caitlyn stated the university's financial aid evaluation "was calculated as if there would be no parenting [sic] contribution." Total aid reduced the $27,000 annual tuition and fees by $19,180 per year, of which $14,000 represented student loans. Caitlyn believed it reasonable to incur only federally subsidized student loans, limiting her debt to $5,500. Consequently, she required plaintiff and defendant to allocate the remaining $17,000 per year. Thereafter, Caitlyn met with the university's Senior Assistant Director of Student Financial Services. When Caitlyn explained she was "unemancipated" for college expense purposes, the university rescinded the financial aid package and required one parent complete the FAFSA.

Plaintiff opposed Caitlyn's motion; defendant did not file pleadings but appeared. The case was assigned to a different Family Part judge. The judge ordered the parties comply with the October 11, 2013 order's prerequisite for economic

mediation. His September 10, 2014 order also required they exchange financial information for the purposes of mediation, and plaintiff agreed to complete the FAFSA parental disclosure. The parties identified a mediator, and the session occurred in early October 2014.[1] Mediation was not successful.

Returning to the newly assigned motion judge, Caitlyn asserted her revised financial aid award was $9,250 per year. She applied for three of four additional loans suggested by plaintiff, but the lenders required co-signors. Caitlyn argued the October 11, 2013 order directed plaintiff and defendant to allocate the university tuition and requested an order directing them to split the cost equally. Plaintiff and defendant opposed this request, asserting the order was limited to 2013-2014 community college tuition and left open other college costs. Further, the parents maintained the judge never considered payment of the university's tuition, which they agreed they could not afford.

The newly assigned motion judge viewed plaintiff and defendant's request not as a change in circumstances, but as a request for reconsideration of the October 11, 2013 order. He concluded reconsideration was not properly before him and must

---

[1] Plaintiff's brief states mediation was held on October 2, while Caitlyn and plaintiff's pleadings identify mediation was held on October 9.

be handled by the initial motion judge. Enforcing his interpretation of that order's provisions, he ordered plaintiff and defendant to satisfy the university tuition 40% and 60% respectively. The October 31, 2014 order also scheduled a plenary hearing to decide reimbursement of community college costs and ordered the parties to mediate any modification requests or future disputes. Finally, the judge denied Caitlyn's application for attorney's fees.

Plaintiff and defendant moved for reconsideration of the October 31, 2014 order. Both argued the order was unfounded, as Caitlyn unilaterally left plaintiff's home; refused to compromise her demands or return home; transferred to an expensive out-of-state university; abandoned completion of community college or attending Rowan. Moreover, Caitlyn refused to communicate with her parents and continued to act independently, without regard to parental input. Finally, the court never reviewed whether and to what extent plaintiff and defendant should or could pay for any expenses beyond community college tuition.

Caitlyn opposed the motions and filed a cross-motion for counsel fees. She additionally filed a separate motion seeking an order of contempt, sanctions, and enforcement of litigant's rights. Disposition was returned to the original motion judge.

15

Concluding the October 11, 2013 order was interlocutory, the judge limited his review to reconsideration of that order and declined to reconsider challenges to the October 31, 2014 order, stating "for today, I can't address that." The judge agreed to clarify Caitlyn's obligation to apply for "all eligible loans . . . and all eligible scholarships." In his oral opinion, he explained Caitlyn must attempt to apply for and make a reasonable effort to secure "five or six" scholarships. He then reviewed each provision of the October 11, 2013 order and concluded the requirement to pay community college tuition was "de minimis." The judge ordered plaintiff and defendant to equally satisfy the claimed balance of $906 and rejected Caitlyn's request for attorney's fees.

This court consolidated plaintiff's appeal and Caitlyn's cross-appeal. Defendant joins in the brief submitted by plaintiff.

II.

A.

"When reviewing a trial judge's order, we defer to factual findings 'supported by adequate, substantial, credible evidence.'" Spangenberg v. Kolakowski, 442 N.J. Super. 529, 535 (App. Div. 2015) (quoting Gnall v. Gnall, 222 N.J. 414, 428 (2015)). However, reversal is warranted when the expressed factual findings are "so manifestly unsupported by or

inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Elrom v. Elrom, 439 N.J. Super. 424, 433 (App. Div. 2015) (quoting Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974)).

Discretionary determinations, supported by the record, are examined to discern whether an abuse of reasoned discretion has occurred. Gac v. Gac, 186 N.J. 535, 547 (2006).

> While an "abuse of discretion . . . defies precise definition," we will not reverse the decision absent a finding the judge's decision "rested on an impermissible basis," considered "irrelevant or inappropriate factors," Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002) (citations . . . omitted), "failed to consider controlling legal principles or made findings inconsistent with or unsupported by competent evidence." Storey[v. Storey], 373 N.J. Super. [464,] 479 [(App. Div. 2004)].
>
> [Elrom, supra, 439 N.J. Super. at 434.]

This court does not accord the same deference to a trial judge's legal determinations. Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013). Rather, all legal issues are reviewed de novo. Ibid.

### B.

As a preliminary matter, we examine Caitlyn's cross-appeal urging dismissal of plaintiff's attack on the October 11, 2013 order as time barred. R. 2:4-1(a) (requiring appeals be filed

within forty-five days of the date final judgment or order is entered).  "Where the appeal is untimely, the Appellate Division has no jurisdiction to decide the merits of the appeal."  In re Hill, 241 N.J. Super. 367, 372 (App. Div. 1990) (citing Alberti v. Civil Service Comm'n, 41 N.J. 147, 154 (1963)).

"Generally, an order is considered final if it disposes of all issues as to all parties."  Silviera-Francisco v. Bd. of Educ. of City of Elizabeth, 224 N.J. 126, 136 (2016).  "By definition, an order that 'does not finally determine a cause of action but only decides some intervening matter pertaining to the cause[,] and which requires further steps . . . to enable the court to adjudicate the cause on the merits[,]' is interlocutory."  Moon v. Warren Haven Nursing Home, 182 N.J. 507, 512 (2005) (alterations in original) (quoting Black's Law Dictionary 815 (6th ed. 1990)).

The distinction between a final order, appealable of right, and an interlocutory order, which is not, is a "principle . . . easily stated," but "not always easily applied."  Wein v. Morris, 194 N.J. 364, 377 (2008).  The distinction is critical because finality is a jurisdictional prerequisite for appeal, R. 2:2-3, and neither the parties nor the trial judge "may invest the Appellate Division with jurisdiction it does not otherwise

have." Pressler & Verniero, <u>Current N.J. Court Rules</u>, cmt. 2.2.1 on <u>R.</u> 2:2-3 (2017).

Without consideration of the legal sufficiency of its terms, we note the October 11, 2013 order answered the question of whether Caitlyn could intervene in her parents' matrimonial action, imposed a limited provision regarding Caitlyn's emancipation, and fixed parental obligations for the 2013-2014 community college tuition costs. The order's terms also addressed "future matriculation" and "subsequent school years," imposing executory obligations on all parties. Had the order resolved all issues regarding Caitlyn's post-secondary school education, it would have been final. However, its terms, as well as the judge's remarks on the provisions, show no final decision was made fixing the extent of the parental support beyond the 2013-2014 community college tuition costs.

The language used in paragraphs four and five of the order set procedures, laying the preliminary groundwork necessary to review allocation of future college costs. However, contrary to Caitlyn's assertion, which was erroneously adopted in the October 30, 2014 order, the issue was never finally adjudicated. For example, paragraph four expressed a need for additional review, reciting Caitlyn's obligations undertaken "<u>before determining</u> the [p]laintiff and [d]efendant's contribution" for

subsequent school years. In addition, paragraph nine mentioned future academic years and imposed an economic mediation prerequisite, which further demonstrates said issues were open. Moreover, during the October 11, 2013 hearing, the judge remarked he had not reviewed financial information and ordered payment shared because the amount was "de minimis." During the December 8, 2014 hearing, the judge clarified there were no prior discussions addressed to payment for the university or another college; the issues were limited to community college.[2]

We conclude the October 11, 2013 order resolved intervention and dealt with the immediate community college tuition. The order settled only the interim issue and did not resolve all college contribution requests or finalize all rights and responsibilities of the parties by finally adjudicating the merits of all issues raised in the action. See Adams v. Adams, 53 N.J. Super. 424, 429 (App. Div.), certif. denied, 30 N.J. 151 (1959).

Once the proceeding concluded on December 8, 2014, with the denial of reconsideration of the October 11, 2013 order and rejection of reconsideration of the October 31, 2014 order, the

---

[2]    We recognize remarks by the initial judge in entering the order suggest the October 11, 2013 order's requirements for modest payment amount appeared directed to deescalate this family's growing alienation and sought to prompt healing of their emotional turmoil.

obligation for college contributions became final for purposes of appeal. Accordingly, plaintiff's appeal properly sought review of all orders leading to the final determination. See Sutter v. Horizon Blue Cross Blue Shield of N.J., 406 N.J. Super. 86, 106 (App. Div. 2009) ("'An appeal from a final judgment raises the validity of all interlocutory orders' previously entered in the trial court." (quoting In re Carton, 48 N.J. 9, 15 (1966))).

## III.

For the first time, plaintiff argues the challenged orders must be vacated because the Family Part has interfered with her constitutional right to raise her daughter.

> "[I]t is a well-settled principle that our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest."
>
> [Zaman v. Felton, 219 N.J. 199, 226-27 (2014) (quoting State v. Robinson, 200 N.J. 1, 20 (2009))].

See also Pressler & Verniero, supra, cmt. 3 on R. 2:6-2. Because we conclude clarification of the law is necessary, we have elected to address the merits of this argument.

Plaintiff's constitutional challenge maintains the court may not interfere with a joint parental decision to set

discipline and achievement requirements for Caitlyn. Caitlyn argues no constitutional violation arises. She urges the court properly enforced her right to support and her right to be educated, and suggests the controversy is only about money. These arguments speak to "the intersection between parents' fundamental liberty interest in the care, custody, and control of their children, and the state's interest in the protection of those children." Fawzy v. Fawzy, 199 N.J. 456, 472-73 (2009).

A.

Unquestionably, "[t]he right to rear one's children is so deeply embedded in our history and culture that it has been identified as a fundamental liberty interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution." Id. at 473 (quoting Moriarty v. Bradt, 177 N.J. 84, 101 (2003), cert. denied, 540 U.S. 1177, 124 S. Ct. 1408, 158 L. Ed. 2d 78 (2004)). "The Federal and State Constitutions protect the inviolability of the family unit." In re Adoption of a Child by W.P. & M.P., 308 N.J. Super. 376, 382 (App. Div. 1998) (citing Stanley v. Illinois, 405 U.S. 645, 651, 92 S. Ct. 1208, 1212-13, 31 L. Ed. 2d 551, 558-59 (1972), vacated on other grounds, 163 N.J. 158 (2000). Therefore, "[p]arents have a constitutionally protected, fundamental liberty interest in raising their biological children." Id. at

382 (citing Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 1394, 71 L. Ed. 2d 599, 606 (1982)). See also Wisconsin v. Yoder, 406 U.S. 205, 232-33, 92 S. Ct. 1526, 1541-42, 32 L. Ed. 2d 15, 35 (1972) (explaining the "primary role" of parents in raising their children is "an enduring American tradition" and establishing the historic recognition of that right as fundamental); Prince v. Massachusetts, 321 U.S. 158, 166, 64 S. Ct. 438, 442, 88 L. Ed. 645, 652 (1944) (identifying privacy interest attached to child rearing, labeled the "private realm of family life which the state cannot enter"); Meyer v. Nebraska, 262 U.S. 390, 399, 43 S. Ct. 625, 626, 67 L. Ed. 1042, 1045 (1923) (characterizing parental right to raise children "as essential to the orderly pursuit of happiness by free men").

As our Supreme Court has stated:

> Deference to parental autonomy means that the State does not second-guess parental decision making or interfere with the shared opinion of parents regarding how a child should be raised. Nor does it impose its own notion of a child's best interests on a family. Rather, the State permits to stand unchallenged parental judgments that it might not have made or that could be characterized as unwise. That is because parental autonomy includes the "freedom to decide wrongly."
>
> [Fawzy, supra, 199 N.J. at 473-74 (quoting Janet Maleson Spencer & Joseph P. Zammit, Mediation-Arbitration: A Proposal for Private Resolution of Disputes Between

> *Divorced or Separated Parents*, 1976 <u>Duke L.J.</u> 911, 913 (1976)).]

<u>See also</u> <u>Sacharow v. Sacharow</u>, 177 <u>N.J.</u> 62, 79 (2003) (holding the Due Process Clause of the Fourteenth Amendment of the United States Constitution "encompasses [the] 'fundamental right of parents to make decisions concerning the care, custody, and control of their own children.'" (quoting <u>Troxel v. Granville</u>, 530 <u>U.S.</u> 57, 67, 120 <u>S. Ct.</u> 2054, 2061, 147 <u>L. Ed.</u> 2d 49, 60 (2000))).

Legislation has been enacted to address and protect the parent-child relationship. Specifically, <u>N.J.S.A.</u> 9:17-39 states a "'parent and child' relationship means the legal relationship between a child and the child's . . . parents . . . to which the law confers or imposes rights, privileges, duties, and obligations." These rights, privileges, duties, and obligations extend to both parents "equally . . . regardless of marital status." <u>N.J.S.A.</u> 9:17-40.

### B.

One duty imposed by law requires parents provide financial support for their children. "The parental obligation to support children until they are emancipated is fundamental to a sound society." <u>Kiken v. Kiken</u>, 149 <u>N.J.</u> 441, 446 (1997). <u>See</u> <u>N.J.S.A.</u> 9:17-53(c) (imposing an obligation to provide child support to those against whom parentage is established).

"In an intact family, the law assumes the parents will provide for the children as well as they can." Kiken, supra, 149 N.J. at 447. Payment of "[c]hild support after divorce is necessary to ensure that a child's basic needs are provided by his parents, who might otherwise neglect their responsibilities to maintain the child." Pascale v. Pascale, 140 N.J. 583, 590 (1995). See N.J.S.A. 2A:34-23(a) (authorizing courts to establish or modify child support in pending matrimonial actions).

The Court has repeatedly emphasized "[c]hildren of divorce have the right to be supported at least according to the standard of living to which they had grown accustomed prior to the separation of their parents." Pascale, supra, 140 N.J. at 592 (citations omitted). To that end, various principles have evolved.

> First, "[o]ne of the fundamental concepts in American society is that parents are expected to support their children until they are emancipated, regardless of whether the children live with one, both, or neither parent." Burns v. Edwards, 367 N.J. Super. 29, 39 (App. Div. 2004) (citing Dunbar v. Dunbar, 190 U.S. 340, 351, 23 S. Ct. 757, 761, 47 L. Ed. 1084, 1092 (1903)); see also Cumberland Cnty. Bd. of Soc. Servs. v. W.J.P., 333 N.J. Super. 362, 365 (App. Div. 2000) (noting that "[a]t common law, parents had an absolute duty to support their children"). The obligation to provide child support "is engrained into our common law,

statutory, and rule-based jurisprudence." Burns, supra, 367 N.J. Super. at 39.

Second, "it is settled that the best interests of the child [are] the greatest and overriding consideration in any family court matter." Monmouth Cnty. Div. of Soc. Servs. v. G.D.M., 308 N.J. Super. 83, 88 (Ch. Div. 1997) (citing Wilke v. Culp, 196 N.J. Super. 487, 489 (App. Div. 1984)). Accordingly, enforcing the parental duty to support children is "an inherent part of the 'best interests of the child' rubric which underlies our family courts." Ibid. Accordingly, "a parent is obliged to contribute to the basic support needs of an unemancipated child to the extent of the parent's financial ability[.]" Martinetti v. Hickman, 261 N.J. Super. 531, 546 (App. Div. 1992). . . . "[C]hildren are entitled to be supported at least according to the standard of living to which they had grown accustomed prior to the separation of their parents," and the "talisman of concern is always the welfare of the child." Guglielmo v. Guglielmo, 253 N.J. Super. 531, 546 (App. Div. 1992).

Third, it is also firmly established that child support is for the benefit of the children; therefore, the right to receive support belongs to the children, not the custodial parent. Pascale, [supra], 140 N.J. at 591; Patetta v. Patetta, 358 N.J. Super. 90, 94 (App. Div. 2003); L.V. v. R.S., 347 N.J. Super. 33, 41 (App. Div. 2001); Blum v. Ader, 279 N.J. Super. 1, 4 (App. Div. 1994).

[Colca v. Anson, 413 N.J. Super. 405, 414-15 (App. Div. 2010).]

The Legislature granted "equitable powers" to the Family Part, which allows the court to enter, revise or alter support

orders "from time to time as circumstances may require." N.J.S.A. 2A:34-23).

Although parental disagreement is most often heightened in divorce matters, the event of divorce is not the basis of the court's authority. Rather, the State's parens patriae responsibility to protect the rights of children is the source of its authority. Importantly, a child's right to support is not "defeated merely because both parents are united in their determination to declare the child emancipated." Johnson v. Bradbury, 233 N.J. Super. 129, 136 (App. Div. 1989).

However, the court's authority to impose support obligations is circumscribed: it terminates with a child's emancipation. Pascale, supra, 140 N.J. at 591; Martinetti, supra, 261 N.J. Super. at 512. "Where there is no longer a duty of support by virtue of a judicial declaration of emancipation, no child support can become due." Mahoney v. Pennell, 285 N.J. Super. 638, 643 (App. Div. 1995).

A determination of emancipation is a legal issue, imposed when the fundamental dependent relationship between parent and child ends. See Dolce v. Dolce, 383 N.J. Super. 11, 17 (App. Div. 2006) (stating emancipation is "the conclusion of the fundamental dependent relationship between parent and child"). It is not automatic and "need not occur at any particular age

. . . ." Newburgh, supra, 88 N.J. at 543. When circumstances surrounding the parent-child relationship support a finding the child is emancipated, "the parent relinquishes the right to custody and is relieved of the burden of support, and the child is no longer entitled to support." Filippone v. Lee, 304 N.J. Super. 301, 308 (App. Div. 1997).

Deciding whether a child is emancipated requires a fact-sensitive analysis. Newburgh, supra, 88 N.J. at 543. "[T]he essential inquiry is whether the child has moved 'beyond the sphere of influence and responsibility exercised by a parent and obtains an independent status of his or her own.'" Filippone, supra, 304 N.J. Super. at 308 (quoting Bishop v. Bishop, 287 N.J. Super. 593, 598 (Ch. Div. 1995)). A court's emancipation "determination involves a critical evaluation of the prevailing circumstances including the child's need, interests, and independent resources, the family's reasonable expectations, and the parties' financial ability, among other things." Dolce, supra, 383 N.J. Super. at 18 (citing Newburgh, supra, 88 N.J. at 545).

A parent establishes "prima facie, but not conclusive, proof of emancipation" when a child reaches the age of majority, now eighteen. Id. at 17. See also N.J.S.A. 9:17B-3. Once the presumption arises, the burden of proof to rebut the statutory

presumption of emancipation shifts to the party or child seeking to continue the support obligation. Filippone, supra, 304 N.J. Super. at 308.

"In certain situations, parents still have an economic duty to support children after their eighteenth birthday . . . ." Llewelyn v. Shewchuk, 440 N.J. Super. 207, 215 (App. Div. 2015) (quoting N.J. Div. of Youth & Family Services v. W.F., 434 N.J. Super. 288, 296 (App. Div.) (quoting Newburgh, supra, 88 N.J. at 543), certif. denied, 218 N.J. 275 (2014)). "[W]hile parents are not generally required to support a child over eighteen, his or her enrollment in a full-time educational program has been held to require continued support." Patetta v. Patetta, 358 N.J. Super. 90, 94 (App. Div. 2003). See also Newburgh, supra, 88 N.J. at 543; Khalaf v. Khalaf, 58 N.J. 63, 71-72 (1971). "[I]n appropriate circumstances, the privilege of parenthood carries with it the duty to assure a necessary education for children." Newburgh, supra, 88 N.J. at 543. In this regard, college costs are recognized as a form of support for unemancipated children. See Gac, supra, 186 N.J. at 542 ("The Legislature and our courts have long recognized a child's need for higher education and that this need is a proper consideration in determining a parent's child support obligation."); Kiken, supra, 149 N.J. at 453 ("N.J.S.A. 2A:34-

23(a) authorizes courts to enter reasonable and equitable support orders, including orders for the education of children.").

Prior to addressing whether parental support is required for a child who reaches majority, the pivotal question is whether the child remains unemancipated. If so, the next consideration is whether the child has an aptitude for college. "Newburgh does not require . . . support and concomitant deferred emancipation for a child unable to perform adequately in his [or her] academic program." Filippone, supra, 304 N.J. Super. at 311-12. If each of these questions is affirmatively answered, then parental ability to afford the significant cost of college must be examined; it is not presumed.

> Some parents cannot pay, some can pay in part, and still others can pay the entire cost of higher education for their children. In general, financially capable parents should contribute to the higher education of children who are qualified students. In appropriate circumstances, parental responsibility includes the duty to assure children of a college and even of a postgraduate education such as law school.
>
> [Newburgh, supra, 88 N.J. at 544.]

To aid this determination, the Court in Newburgh provides specific factors guiding the analysis of whether and to what extent an obligation to pay for higher education is imposed. Id. at 545. The Newburgh factors

must be carefully applied by the trial court in light of a wide range of relevant facts and circumstances. The undertaking cannot be accomplished except after a presentation of all the evidence through direct and cross-examination and until the trial court has had an opportunity to observe the demeanor of the witnesses. The issue . . . implicates "highly significant policy considerations," and for this reason should not be decided on less than a full record.

[Bradbury, supra, 233 N.J. Super. at 136-37 (quoting Jackson v. Muhlenburg Hosp., 53 N.J. 138, 142 (1969)).]

"It remains the ultimate responsibility of the judiciary to address the fact[-]sensitive issue of emancipation when presented." Pennell, supra, 285 N.J. Super. at 643. As we have recently advised: "The critical evaluation required for emancipation determinations typically necessitates a plenary hearing, especially 'when the submissions show there is a genuine and substantial factual dispute[,]' which the trial court must resolve." Shewchuk, supra, 440 N.J. Super. at 217 (quoting Hand v. Hand, 391 N.J. Super. 102, 105 (App. Div. 2007)). So too, the examination of parental obligations to provide college contributions for unemancipated children requires a hearing. Bradbury, supra, 233 N.J. Super. at 136-37.

C.

Applying these principles to the facts at hand, we reject plaintiff's challenge attacking the order allowing Caitlyn to

intervene.  We conclude the judge correctly determined Caitlyn had standing to do so.  Llewelyn, supra, 440 N.J. Super. at 214; Bradbury, supra, 233 N.J. Super. at 136.  See also Pressler & Verniero, supra, cmt. 1 on R. 4:33-1 (requiring a party moving to intervene must "show an interest in the subject matter of the litigation, an inability to protect that interest without intervention, lack of adequate representation of that interest, and timeliness of the application").  Caitlyn has an interest in advancing the position she is unemancipated and in need of her parents' support.

However, plaintiff's challenge to the conclusion Caitlyn was unemancipated must be considered.  Here, the October 11, 2013 order and hearing record are void of factual findings supporting such a legal conclusion.  Following our review, we are unable to determine how or why the judge concluded to vacate the prior order of emancipation.

Rule 1:7-4(a) requires a judge, "by an opinion or memorandum decision, either written or oral, find the facts and state [all] conclusions of law . . . on every motion decided by a written order that is appealable as of right . . . ."  Fodero v. Fodero, 355 N.J. Super. 168, 170 (App. Div. 2002).  We emphasize a judge's failure to perform the fact-finding duty "constitutes a disservice to the litigants, the attorneys and

the appellate court." Curtis v. Finneran, 83 N.J. 563, 569-70 (1980) (quoting Kenwood Assocs. v. Bd. of Adjustment Englewood, 141 N.J. Super. 1, 4 (App. Div. 1976)).

In opposing Caitlyn's motion, plaintiff and defendant asserted Caitlyn, by her own actions and decisions, was emancipated. The certifications accompanying the motion papers include quite divergent statements on this single issue. Not only is there a material dispute about why Caitlyn left plaintiff's home and did not seek residence with defendant, but also at issue is whether Caitlyn diligently pursued her secondary school education, whether she was a full-time student, and whether Caitlyn affirmatively rejected efforts undertaken to exercise reasonable parental influence to require she act responsibly.

Plaintiff and defendant emphatically rejected the narrative they "secretly" sought emancipation to avoid financial responsibility. Rather, plaintiff and defendant maintain Caitlyn frivolously squandered their emotional and financial efforts because she desired to do what she wanted, without parental oversight. They argue Caitlyn rejected their authority to strike out on her own, sealing her emancipated status.

On the other hand, Caitlyn asserts she "made some mistakes" but was dutiful and reasonably compliant. However, her parents

continued to impose "impossible" requisites, in a joint effort to thwart her efforts by foreclosing financial assistance.

It appears the initial motion judge recognized plaintiff and defendant's prior provision of educational support to allow Caitlyn's attendance at community and Disney college. He may have assumed Caitlyn remained dependent and, therefore, was unemancipated. The judge's comments also suggest a desire to save the parties time and money by avoiding a plenary hearing on the subject, perhaps believing payment of the relatively small sum in controversy might mitigate fractures caused in the family and reunite the parties.

Despite these very well intentioned purposes, the threshold legal question of emancipation, which must precede any Newburgh analysis, was not examined. Plaintiff and defendant advanced facts showing Caitlyn, who was well over the age of eighteen, rejected parental guidance and advice, because they were accompanied by strings related to discipline and performance. Caitlyn does not deny she committed the complained of conduct or that her actions triggered parental demands for reform. Rather, she dismisses her behavior as "things that teenagers typically do," tempered by an admission she made some mistakes.

Whether Caitlyn's actions were irresponsible, as plaintiff and defendant suggest, or youthful, as Caitlyn insists, begs the

question. What is required is an examination of events that triggered Caitlyn's departure from her mother's home and the resultant March 30, 2013 order of emancipation. The fact that Caitlyn is not living with either parent is significant. How that event occurred bears heavily on whether Caitlyn exercised "an independent status of . . . her own" and became emancipated. Filippone, supra, 304 N.J. Super. at 308.

Caitlyn's subsequent decisions and interactions with her parents also bears on this issue. The dependent parent-child relationship indicative of unemancipation is not merely shown by a child's claimed need for financial support. Our jurisprudence unmistakably mandates there must be examination of the parent-child relationship itself. Shewchuk, supra, 440 N.J. Super. at 216. In fact, a better description is the relationship is one of interdependence: the child's right to support and the parents' obligation to provide payment are inextricably linked to the child's acceptance and the parents' measured exercise of guidance and influence. Conversely, a finding of emancipation is a recognition of a child's independence from a parental influence.

Despite the detail of events and the expressed strength of conviction, the positions of the parties' in their pleadings are at odds, and the legal conclusion Caitlyn is unemancipated

cannot be upheld. Such "material factual disputes presented by the parties' pleadings bear directly on the legal conclusions required to be made and these disputes can only be resolved through a plenary hearing." Spangenberg, supra, 442 N.J. Super. at 540-41. See Hand, supra, 391 N.J. Super. at 105 (stating a plenary hearing is necessary when the parties' submissions show a genuine and substantial factual dispute). The parties are entitled to present their proofs and the judge must sift through the evidence and state the supported factual findings. Importantly, "[t]he credibility of the parties' contentions may wither, or may be fortified, by exposure to cross-examination and through clarifying questions posed by the court[]" in a plenary hearing. Barblock v. Barblock, 383 N.J. Super. 114, 122 (App. Div.), cert. denied, 187 N.J. 81 (2006). See also Segal v. Lynch, 211 N.J. 230, 264-65 (2012) (holding a "genuine, material and legitimate factual dispute" requires resolution following a plenary hearing).

If her parents' prove their claims, Caitlyn's choices have consequences: a child is free to control his or her life; however, this course relieves her parents of the obligation to finance such self-determined decisions. See Black v. Black, 436 N.J. Super. 130, 146 (Ch. Div. 2013) ("If an adult 'child' refuses to have a relationship with a parent without a clear

showing of exceptional circumstances, and . . . refuses to participate in trying to heal the relationship, . . . the child's message rings loud and clear . . . the parent/child relationship no longer has any value."). If the evidence sustains Caitlyn's version of events that her parents "threw" her out despite her rigorous compliance with their "impossible" demands, the court must protect the child's right to financial support.

We also correct what appears to be a misinterpretation of the law. We focus on the declaration Caitlyn was "un-emancipated [sic] solely for the purpose of a potential contribution from [her parents] as it relates to college costs."

A child's decision to seriously pursue a college education alone does not create the required dependency allowing him or her to be unemancipated. In Filippone, this court concluded the parties' son, who left home at age fourteen, was not emancipated until he reached the age of majority and, thereafter, unsuccessfully completed college classes. Filippone, supra, 304 N.J. Super. at 312. In Llewelyn, we affirmed the Family Part's finding the plaintiff-child failed to rebut the presumption of emancipation, when she decided to leave her mother's home, despite her later pursuit of education as a full-time college student. Llewelyn, supra, 440 N.J. Super. at 218-19.

Thus, facts matter, and the judge must fully analyze all circumstances that separated Caitlyn from her parents and their homes. It is insufficient to merely review Caitlyn's decisions and her parents' financial status at the time Caitlyn filed her motion. An independent child choosing her own path is not entitled to support because support is due only to a child who is not emancipated. Pennell, supra, 285 N.J. Super. at 643.

For the reasons stated, we affirm the order allowing Caitlyn to intervene. We reverse, as factually unsupported, the provisions in the October 11, 2013 order concluding Caitlyn is unemancipated and plaintiff and defendant must provide college contributions. On these issues, the October 11, 2013 order is vacated, and the matter remanded for further proceedings, including a plenary hearing. See Tretola v. Tretola, 389 N.J. Super. 15, 20-21 (App. Div. 2006) (reversing a court's denial of the plaintiff-father's request to emancipate his son because the court "failed to recognize there were material facts in dispute and evidence beyond the motion papers necessary for resolution of the matter" following an evidentiary hearing, when the child is "both employed and attending college full time.").

On October 31, 2014, the provisions of the October 11, 2013 order were mistakenly viewed as requiring each parent contribute to any and all college costs. However, the record shows no

analysis of Newburgh's factors was undertaken, and the prior order was based on less than a complete record. Moreover, as we point out, no findings supported the issue of emancipation. Consequently, the October 31, 2014 order, which purported to enforce the October 11, 2013 order, is also vacated. We add these additional comments to aid review on remand.

Once the issue of emancipation is decided, an obligation to pay college costs for an academically motivated unemancipated child requires a two-fold analysis. First, it demands a determination of whether equitable or other considerations militate against parents paying college costs. See Gac, supra, 186 N.J. at 547 ("[A] parent or child seeking contribution should initiate the application to the court before the expenses are incurred. The failure to do so will weigh heavily against the grant of a future application."); Moss v. Nedas, 289 N.J. Super. 352, 356 (App. Div. 1996) (noting parent cannot be viewed as a "wallet" and deprived of involvement of college decision making process); Black, supra, 436 N.J. Super. at 146 ("[A] student's rejection of the opportunity to attempt reunification with a parent may be factually so compelling as to equitably overshadow and eclipse the other Newburgh factors, and tilt the scales of justice in favor of suspending or completely

terminating the parent's obligation to financially contribute towards the child's college education.").

Second, the court must scrutinize whether the parents are financially capable of contributing. <u>Weitzman v. Weitzman</u>, 228 <u>N.J. Super.</u> 346, 357 (App. Div. 1988). This requires broader consideration than parental gross incomes. Other financial obligations, expenses and debts must be weighed. Here, for example, plaintiff and defendant each are responsible to support other minor children, which reduces income available to pay college costs. Indeed, the college student's contribution also should be factored. This includes assets, income, scholarships, loans and other financial aid.[3]

The October 31, 2014 order includes no analysis supporting the allocation of the university tuition, fees and books, 40% to plaintiff and 60% to defendant. Therefore, even if Caitlyn is found to be unemancipated, the order cannot stand. <u>See</u> <u>Rule</u> 1:7-4(a).

We reject Caitlyn's claim plaintiff's motion for reconsideration was untimely and also reverse the December 8, 2014 order. Plaintiff challenged the October 31, 2014 order's interpretation of provisions ordered on October 11, 2013.

_____

[3] We note, the December 6, 2014 order clarified Caitlyn's responsibility to apply for scholarships, and she acquired financial aid.

Unfortunately, the reviewing judge erred when he limited his authority to consider only the terms of the October 11, 2013 order.

## IV.

We turn to Caitlyn's cross-appeal, which seeks reversal of the provisions denying her application for attorney's fees on October 31, 2014 and December 8, 2014. New Jersey does not subscribe to a system that "loser pays." Statutory provisions, N.J.S.A. 2A:34-23, court rules, R. 5:3-5(c), R. 4:42-9(a), and interpretative case law, see, e.g., Mani v. Mani, 183 N.J. 70, 94-95 (2005), clearly outline necessary considerations when imposing a counsel fee award. The reviewing judges made findings, albeit limited ones, regarding the plaintiff and defendant's good faith in advancing the arguments presented, which encompasses one consideration. Reese, supra, 430 N.J. Super. at 586. Nevertheless, since we have vacated the orders, attorney fee requests may abide the ordered remand proceedings.

## V.

In summary, the starting point of the remand proceedings determines whether Caitlyn was emancipated when she left her parents' homes. Only when Caitlyn proves she was unemancipated must a Newburgh analysis commence. See Newburgh, supra, 88 N.J. at 542 ("Resolution of [the right to continued educational

support] centers on a parent's duty to support a child until the child is emancipated. Consequently, [the child], if unemancipated, may be entitled" to continued support). This includes all facts and circumstances surrounding the requested college contributions, including the scope and cause of ongoing estrangement and non-communication. Cf. Philipp v. Stahl, 344 N.J. Super. 262, 272-73 (App. Div. 2001) (holding the absence of a relationship between parent and child was "one of the many factors that go into" the determination of post-secondary support), rev'd on other grounds, 172 N.J. 293 (2002). See also Gac, supra, 186 N.J. at 546 (noting a parent or child seeking contribution for college expenses must inform and communicate with the parties concerning "the many issues inherent in selecting a college"); Nedas, supra, 289 N.J. Super. at 356. Upon an affirmative showing college contribution is warranted, the inquiry turns to the amount of the financial obligation itself. This encompasses parental ability to pay, Weitzman, supra, 228 N.J. Super. at 357 (stating among the Newburgh factors, parents' ability to pay is clearly the most significant), the child's contributions, and reasonableness of choice to enroll in a chosen school, despite a comparable available education at other more economical universities, see

Finger v. Zenn, 335 N.J. Super. 438, 444-45 (App. Div. 2000), certif. denied, 167 N.J. 633 (2001).

Our final comments are observational. A plenary hearing on emancipation, mandated by law, has one winner and the chasm between parents and child surely will widen whatever the outcome. The initial motion judge was very sensitive to this possibility and urged the parties to seek an alternate course to reach resolution. We applaud that effort imbued with common sense. We also recognize demands placed on our Family Part judges do not allow the luxury of uninterrupted consideration of one matter at a time. Therefore, in addition to being emotionally draining and time consuming, litigation is expensive. In light of these realities, before undertaking the course outlined by law, we encourage the parties give serious consideration to whether their positions, and hopefully their relationship, could be reconciled by a different course of dispute resolution, which unlike litigation, might more closely address the dynamic and complex interactions between parents and child.

Affirmed in part, reversed and remanded in part for additional proceedings as discussed in this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION