**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4617-17T4

DAVID WEINMAN,

      Plaintiff-Respondent/
      Cross-Appellant,

v.

LAURA WEINMAN, n/k/a
LAURA WEINMAN-TRICHON,

      Defendant-Appellant/
      Cross-Respondent.

_____

      Argued telephonically April 22, 2020 –
      Decided May 12, 2020

      Before Judges Koblitz, Gooden Brown and Mawla.

      On appeal from the Superior Court of New Jersey,
      Chancery Division, Family Part, Union County, Docket
      No. FM-20-0509-14.

      Brian P. McCann argued the cause for appellant/cross-
      respondent (Callagy Law, PC, attorneys; Brian P.
      McCann, on the briefs).

      James P. Yudes argued the cause for respondent/cross-
      appellant (James P. Yudes, PC, attorneys; James P.

Yudes, of counsel; Kevin M. Mazza and Elsie Gonzalez, on the briefs).

PER CURIAM

Defendant Laura Weinman-Trichon appeals from an April 30, 2018 order entered following a twenty-one-day post-judgment plenary hearing adjudicating the issues of emancipation, child support, and college contribution. Plaintiff David Weinman cross-appeals challenging the denial of counsel fees. We affirm.

We recite the relevant facts, which are set forth in greater detail in Judge Thomas J. Walsh's thorough and well-written forty-page opinion. The parties married in 1992. The marriage lasted nine years during which they had a son and a daughter born in 1998 and 2000, respectively. From the outset of the parties' separation in April 2001, a few months before plaintiff filed the complaint, defendant involved the children either directly or indirectly in the parties' conflict. Even though pendente lite plaintiff enjoyed joint legal custody and shared parenting, defendant continuously violated court orders by depriving him of parenting time or disparaging him to the children, who were then just a three and one-year old.

Defendant's conduct increased when plaintiff began dating his now wife. Defendant began to control where plaintiff could enjoy parenting time and

2

continued to limit it and involve the children in every unfortunate exchange and incident with plaintiff. When defendant began dating a man whom she would later marry, she enlisted his efforts in the conflict, leading to confrontations with plaintiff and police involvement, which the children witnessed.

Notwithstanding these difficulties, the parties settled their case and divorced in 2003. Their amended judgment of divorce stated they agreed to share joint legal custody of the children, designated defendant the parent of primary residence and awarded plaintiff parenting time one evening per week and alternate weekends, shared the holidays on an alternating year basis, and allotted him one week of his choice for summer vacation. Plaintiff agreed to pay child support and provide medical insurance for the children.

Regarding college expenses, the parties' agreement stated:

> At such time as each child graduates from high school and has the academic ability and inclination to attend college or other post high school educational institution, the parties shall be responsible for payment for the costs and expenses thereof according to their respective incomes and financial ability. The parties shall confer and consult with each other concerning the choice of college and the cost. Each child shall apply for all available loans, grants, and scholarships.

Post-judgment, defendant continued to interfere with parenting time, leading plaintiff to file an enforcement motion in 2003. On July 25, 2003, the

3

court granted plaintiff's motion and appointed a therapeutic mediator to work with the family, with authority to "issue directives" and "report to the court." Defendant's conduct did not abate. She signed municipal complaints against plaintiff's then-fiancé alleging harassment; despite an agreement reached with the aid of the therapeutic mediator, she refused to allow the children to attend plaintiff's wedding, necessitating police involvement; and she complained to municipal officials that the children were made to sleep in a basement in violation of fire regulations.

Defendant continued to frustrate plaintiff's parenting time by relocating from Passaic to Union County. As a result, plaintiff relocated his dental practice and residence to Union County to be near the children, only to have defendant move the children to Pennsylvania. Following more litigation, the parties executed a consent order in June 2007 allowing defendant to remove the children to Pennsylvania, with jurisdiction remaining in New Jersey.

Pursuant to the consent order, the parties agreed plaintiff would have parenting time with the children every other weekend from Friday night until Sunday. However, defendant frustrated plaintiff's contact with the children. She refused to meet in person with the therapeutic mediator and refused to communicate in a civil manner or cooperate with the parent coordinator.

4

Defendant continued to enlist her now-husband's involvement to prevent parenting time, which led to confrontations at the children's sports events and email communications wherein defendant's husband purported to school plaintiff on parenting. During 2008, the parties had several meetings with the therapeutic mediator to address defendant's interference with parenting time, but defendant did not cooperate.

Beginning in 2008, defendant started empowering the children, then ten and eight years of age, to communicate directly with plaintiff regarding parenting time. The children's communications uniformly offered excuses defendant gave them as to why they would not see plaintiff. As a result, plaintiff missed important holidays and did not see the children for several months. Furthermore, defendant continued to assail plaintiff with vitriolic emails. When plaintiff complained to the therapeutic mediator, defendant responded she would not permit the therapeutic mediator to dictate to her how to write an email.

As a result, in February 2009, plaintiff filed an enforcement motion regarding parenting time. The court entered an order requiring defendant to cooperate in facilitating plaintiff's parenting time and to participate in quarterly meetings with the therapeutic mediator.

A-4617-17T4

In March 2009, the court wrote to the parties, relaying the therapeutic mediator's opinion that defendant was interfering with plaintiff's involvement with the children. The court's letter further stated the therapeutic mediator's recommendation that plaintiff "should have at least one full weekend with the children without interference by the mother." On April 2, 2009, the court appointed the therapeutic mediator as a parenting coordinator.

The parties met with the parenting coordinator in May 2009, agreed to adjust plaintiff's parenting time to once-monthly uninterrupted weekends with the children where they would not participate in their sports or social events. However, on Labor Day weekend 2009, defendant failed to deliver the children for their scheduled weekend with plaintiff. The parenting coordinator wrote to the court stating defendant "continues to thwart parenting time between the children and their father."

The children continued to email plaintiff directly regarding parenting time, and virtually all their communications sought to limit or cancel parenting time. When plaintiff invited the children to his stepson's bar mitzvah, the children ultimately agreed to attend the reception only, after the parenting coordinator intervened. When plaintiff emailed the parties' daughter asking her to wear a "fun dress" to the event, defendant later emailed him to suggest his

6

wife dictated their daughter's attire, that his wife was the "boss" and plaintiff a "mouse," and that defendant and the children consider it "a source of entertainment at dinner!"

In September 2010, following a dispute with defendant, the parenting coordinator resigned. The parties' post-judgment litigation continued in 2011. The court entered orders dated April 25, 2011, which in pertinent part appointed a new parenting coordinator and found defendant in violation of litigant's rights for refusing to cooperate with the prior parenting coordinator. Plaintiff's parenting time continued to be sporadic and limited to no more than once per month.

In October 2013, defendant filed a motion for New Jersey to relinquish jurisdiction in favor of Pennsylvania and to fix the parties' respective obligations for the children's college expenses. Plaintiff cross-moved to vacate any "obligation to contribute toward [the] children's college education expenses unless the [d]efendant strictly complies with a number of conditions precedent" involving parenting time. After extensive litigation on the issue of jurisdiction, including before us,[1] the parties consented to maintaining jurisdiction in New Jersey. The college contribution issue was not resolved.

---

[1] Weinman v. Weinman, No. A-2096-13 (App. Div. Jan. 29, 2015).

From January 2014 through June 2015, plaintiff contacted the children regarding parenting time, but they refused to see him. In February 2015, defendant filed a motion, including a request to review child support and allocate college expenses. Plaintiff cross-moved for reunification therapy with the children. On April 24, 2015, the court entered an order directing both parties to complete a best interest evaluation, psychological evaluations, and reunification therapy. The second parenting coordinator resigned a few days before entry of the order.

In June 2015, the parties entered into a consent order appointing a reunification therapist. The reunification therapist testified the understanding was she would report to the court regarding her work with the family and their meetings would not be confidential.

During this time, the parties' son was searching for colleges. Plaintiff emailed defendant asking to be included in the college decision process and she replied that he had "been given many opportunities to be involved in the college selection process" but chose not to participate, and if there were any schools he wanted their son to consider, he should advise her and she would arrange for visits. Plaintiff also communicated with the parties' daughter about parenting time, but she did not respond.

A-4617-17T4

The parties and the children completed a best interests assessment with a court appointed evaluator who issued a report in August 2015. Defendant and the parties' daughter told the evaluator plaintiff was to blame for the difficulties in their relationship and both children stated they did not want a relationship with him. The evaluator concluded both children "need time to reconnect with their father without feeling they are rejecting or abandoning their mother." She recommended the reunification therapy continue.

In August 2015, the children's paternal grandfather died, and plaintiff asked them to attend the funeral, but they declined. Plaintiff expressed disappointment at the state of their relationship and texted the parties' daughter the following: "this truly saddens me but I will always keep the door open and I want to talk about it with [reunification therapist] at [our] next meeting."

The next month the reunification therapist terminated therapy due to the lack of progress. She wrote to the court and explained that after meeting with the children for eight sessions and attempting to "work toward unified visitation," the children "remained intractable in their willingness to even discuss" reunification. She stated neither child wanted to visit in plaintiff's home and desired only a superficial relationship with him.

A-4617-17T4

In September 2015, defendant participated in a psychological evaluation, which concluded she was "guarded and defensive" and overreacted to minor or normal stress with extreme concern and complaints. The evaluation concluded the "[p]rior attempts at reconciling the children with their father were thwarted by [defendant]" and she "demonstrated developmentally inappropriate empowerment of children to choose and decide to be with their father." The evaluator diagnosed defendant with histrionic personality disorder.

Plaintiff's psychological evaluation concluded he was "outgoing and friendly[,]" capable of handling day-to-day stressors, displayed appropriate expectations of the growth and development of children, as well as an understanding of appropriate family roles. The evaluation concluded plaintiff exhibited a psychologically healthy outlook on life.

By December 2015, the parties' son applied and was admitted to several colleges, all without any input from plaintiff. Defendant provided plaintiff with copies of the acceptance letters, asked him to complete a financial aid application for colleges, and he complied. In February 2016, the court ordered a second best-interests evaluation. The court reserved its decision, pending the plenary hearing, on defendant's application to have plaintiff contribute to the

10

children's college expenses and for a recalculation of child support in light of plaintiff's allegation that "he has been alienated from the children" by defendant.

In April 2016, plaintiff emailed the parties' son to express his support during the college decision process and hope they could have a relationship. He recommended the son attend Penn State for its "world-renowned engineering department as well as the world's largest alumni network" and offered to contribute $12,000 per year toward tuition. He wrote "I truly want to guide you and be [a part] of the decision." The parties' son, who ultimately did not attend Penn State, replied by rejecting plaintiff's suggestion and stating plaintiff's email demonstrated "why I don't have a relationship with you right now."

The next communication plaintiff received were emails in May 2016 from defendant and later the parties' son informing plaintiff of the school the son selected. Given the son's enrollment, the court granted defendant's motion for contribution to college and ordered plaintiff to pay one-half of the son's expenses pending the plenary hearing.

Plaintiff texted the parties' daughter during the summer of 2016 but received no response. In August 2016, defendant contacted plaintiff only to advise him of his portion of the costs for the daughter's SAT tutor. Plaintiff complied with his court ordered obligation to pay one half of the son's fall 2016

and spring 2017 tuition and expenses. He also paid his half of the daughter's college application and SAT fees.

The second best interests evaluation was completed in September 2016. Each child told the evaluator they did not want to interact with plaintiff's wife. The parties' daughter stated she was too busy to spend full weekends with plaintiff. At the conclusion of plaintiff's session with the children, he hugged them and told them he loved them. In defendant's session with the evaluator, she expressed frustration at plaintiff's attempt to become involved in the college process. The evaluator concluded "[u]nfortunately, [the children] were not provided with the opportunity to spend time with their father, to heal hurt feelings, [and] to persevere during difficult times." She strongly recommended individual therapy, and defendant "remove herself from the situation" allowing the children and their father "to navigate their future." She also encouraged the children to "work on resolving their feelings" and devote "the time and opportunity to grow" a relationship with plaintiff.

The college selection process for the parties' daughter mirrored the son's. In July 2017, plaintiff emailed the daughter to express support during the college process, offered to contribute financial assistance to match what he was paying for the son's education and suggested she apply to public and private schools to

12

increase her chances at receiving aid. The daughter replied that she would apply to the schools that would give her "the best opportunity to succeed" and also wrote "[y]ou made it very clear that in order for us to have a relationship, I would have to have a relationship with your wife. I will tell you the same thing now that I told you then – that's not going to happen." Plaintiff's reply denied that she needed to have a relationship with his wife to have a relationship with him and offered to return to reunification therapy. However, the parties' daughter declined. Instead, in October 2017, plaintiff received an email from defendant informing him of the colleges their daughter planned to apply to, requesting plaintiff complete financial aid forms and offer the daughter advice on how to handle college admission interviews.

At the plenary hearing, plaintiff, his wife, the reunification therapist, best interests evaluator, psychological evaluator, and plaintiff's forensic accountant[2] testified. Defendant, the children, and defendant's forensic accountant also testified. In addition to the testimony, Judge Walsh considered volumes of written materials, including the parenting coordinator's notes, emails, text messages and other communications between the parties and the children.

---

[2] Prior to the plenary hearing, the parties engaged separate forensic accounting experts to prepare a cash flow analysis of plaintiff's dental practice to determine his ability to contribute to college expenses.

The judge concluded as follows:

> Simply stated, this may be the worst case of parent alienation this court has ever seen. The efforts of [d]efendant . . . to ensure that [p]laintiff could not have a full and meaningful relationship with his children started on day one of the marital discord and continue to this day. This was evidenced by [d]efendant ensuring that her infant children were present, to watch [p]laintiff move out, telling them that their father was leaving them. It continued when she immediately began to dictate the exact terms and circumstances when [p]laintiff would see his children, at one point insisting he could only have visitation in the former marital residence. The court was asked, early and often, to allow him to have visitation and then to enforce visitation. She would ignore every [c]ourt [o]rder, repeatedly forcing the matter back to court. Plaintiff would beseech the court for help. He would repeatedly involve the police departments to enforce his rights to see his children. . . .
>
> . . . .
>
> A number of altercations occurred . . . [including] violent arguments that this court finds were largely instigated by [d]efendant and over time involving [plaintiff's wife] much more than [p]laintiff. Having had the opportunity to observe the testimony and review the evidence, it is easy for this court to see why [p]laintiff's countenance is much more reserved than his current wife. He is not a man given to show a great deal of outward emotion. Despite incredible claims from the [d]efendant, there is not a single piece of evidence over the course of these nearly twenty years where [p]laintiff would be gratuitously nasty, which the correspondence show is her stock in trade. He is a quiet

14

and reserved type who would strain to avoid conflict. The same does not seem true of his wife.

. . . .

The truth is there was a paucity of actual things that [p]laintiff did that would warrant any estrangement from the children. Given this, the court concludes, [d]efendant made up allegations. Defendant complained they were sleeping in an illegal basement, an assertion rejected by both the family court and [municipal] officials. She claimed that [p]laintiff was cutting up the children's clothing. She told [the parties' son] that his father had obviously drowned his phone. When they moved to [Union County], she again made an identical complaint about the sleeping conditions. The children were so caught up with the craziness that when their father wrote to them, they claimed it was actually [his wife] 'ghost writing' the messages. Defendant admitted that they would sit around and ridicule [plaintiff] and [his wife]. Her denial at trial, as against the absolute mountain of evidence to the contrary, is simply not credible.

The children's perspective of their father is completely warped because of the alienation. [The parties' son] did not remember that his father was his first soccer coach, crediting his stepfather with being the only one who helped him with soccer. The children complained that their father would not come to their events, or take them to them, during his parenting time. They had no way to know, of course, that the parenting coordinator attempted to have [d]efendant stay away from the events when [p]laintiff had parenting time, since there had been so much hostile interaction, a suggestion she refused. The truth is [p]laintiff would make the drive to Pennsylvania, and they would only be allowed to say a quick hello, not spend any time with

15

him. [The parties' daughter] did not even remember him going at all.

The facts show that the alienation was a long ago success. It started when they were infants and grew worse. When they were barely in grade school, [d]efendant empowered them to communicate directly with their father that they did not want to attend visitation. When he relocated his home and medical practice to be closer to them, they were almost immediately spirited away to Pennsylvania.

Neither of the children so much as invited their father to their [b]ar/[b]at [m]itzvah, with [the parties' son] admitting he was not invited by claiming it was a ["]public event["]. This shows that by the time they were thirteen years old, they had essentially written him out of their lives. When their [paternal] grandfather . . . passed away, they would not even attend the funeral unless it was on their terms. [The parties' daughter] admits she has never even contacted her father on his birthday. When the court ordered that they participate in a best interest evaluation, they reacted in anger, with [the son] saying he was nearly eighteen and should be done with this. When the reunification therapist suggested they focus on the future, they were outraged that they did not get to air their list of grievances. At all times, they adamantly refused contact with [plaintiff's wife].

Finally, the mindset of [the parties' son] as he prepared for college is completely encapsulated in his essay in support of a scholarship. Line one read: "During my high school career, I have had to endure my parent's acrimonious divorce." Of course, it goes without saying that the "acrimonious divorce" took place when [he] was a toddler. The only thing happening during [his] high school years was his

father's efforts to have a relationship with him. The second line read: "My father chose not to be a prominent figure in my life, but he did choose to be one in my mother's life, making things extremely difficult both financially and emotionally for her, and by extension, my sister and me." Again, none of this is true whatsoever. Assuming [the parties' son] believes what he wrote, which this court accepts; his mother had to have [misled] him.

Finally, even with the issue of college contribution pending before the court, both [children] chose to exclude [p]laintiff from the process, allegedly depending on their mother to send emails updating the process. He was, for all intents and purposes, completely excluded. In addition, they made clear, both at the best interests evaluation and in therapeutic reunification that they would not even consider a relationship with their father unless it was exactly on their terms.

Judge Walsh's order emancipated the children as of their eighteenth birthdays, finding their conduct placed them beyond plaintiff's sphere of influence. As a result, the judge concluded plaintiff should not have any obligation to pay for their college educations. Notwithstanding the children's emancipation, the judge analyzed the Newburgh v. Arrigo[3] factors and found they did not favor compelling plaintiff to fund college. He ordered the funds plaintiff paid for college without prejudice be returned to him. The judge

---

[3] 88 N.J. 529 (1982).

calculated a child support figure retroactive to the date the parties' son turned eighteen and then calculated a reduced figure for the daughter's support, until her graduation from high school.

The judge addressed each party's request for counsel fees pursuant to the relevant factors under the court rules. He noted plaintiff attempted to settle the dispute by offering to pay the equivalent of Penn State tuition for each child's education. Plaintiff spent $286,427 and defendant $163,259.49 to try the case. The judge concluded plaintiff was in better financial condition and defendant's financial condition was unknown. The judge found plaintiff made good faith attempts to engage in discovery and defendant violated discovery orders, which caused the court to bar evidence she did not produce until the trial. However, the judge concluded the financial circumstances did not warrant awarding plaintiff fees.

## I.

> "When reviewing a trial judge's order, we defer to factual findings 'supported by adequate, substantial, credible evidence.'" However, reversal is warranted when the expressed factual findings are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice."

> Discretionary determinations, supported by the record, are examined to discern whether an abuse of reasoned discretion has occurred.
>
> While an "abuse of discretion . . . defies precise definition," we will not reverse the decision absent a finding the judge's decision "rested on an impermissible basis," considered "irrelevant or inappropriate factors," "failed to consider controlling legal principles or made findings inconsistent with or unsupported by competent evidence."
>
> This court does not accord the same deference to a trial judge's legal determinations. Rather, all legal issues are reviewed de novo.
>
> [Ricci v. Ricci, 448 N.J. Super. 546, 564-65 (App. Div. 2017) (internal citations omitted) (alteration in original).]

## A.

Defendant argues the decision to declare the children emancipated and terminate plaintiff's obligation to contribute to college expenses was an abuse of discretion. She asserts the judge overemphasized the children's lack of relationship with plaintiff. She argues the children were not emancipated because they remained financially dependent and the judge "improperly intertwined" emancipation with the college contribution dispute. She asserts the college contribution issue was settled when the parties divorced and the court

should have enforced their agreement pursuant to <u>Avelino-Catabran v. Catabran</u>, 445 N.J. Super. 574 (App. Div. 2016), rather than undertake a new analysis pursuant to <u>Newburgh</u>.

"A child's decision to seriously pursue a college education alone does not create the required dependency allowing him or her to be unemancipated. . . . [F]acts matter, and the judge must fully analyze all circumstances that separated [the child] from [his or] her parents and their homes." <u>Ricci</u>, 448 N.J. Super. at 577-78. Judge Walsh's finding that the children were estranged from plaintiff, wanted no relationship with him, let alone allowed him to meaningfully participate in the college selection process as the parties had agreed during the divorce, is amply supported by the substantial, credible evidence in the record.

In situations where a child seeks neither a relationship, nor guidance from a parent, and instead looks to a parent only as a source of funds, that parent is relieved of the obligation to fund the child's college education. <u>See</u> <u>Moss v. Nedas</u>, 289 N.J. Super. 352, 356 (App. Div. 1996) (noting a parent cannot be viewed as a "wallet" and deprived of involvement in the college decision making process).

We disagree that the parties' prior agreement to share the college obligation irrevocably bound the judge.

Although the court will enforce an agreement to the extent it is just and equitable, when it appears no longer fair to do so, the court is not bound by the agreement or its prior orders. . . . Thus, "if circumstances have changed in such a way that requiring [a party] to pay for college would no longer be equitable and fair, the court also remains free to alter the prior arrangement."

[Moss, 289 N.J. Super. at 359-60 (quoting Lepis v. Lepis, 83 N.J. 139, 161 n.12 (1983)).]

The circumstances here differ from Avelino-Catabran. In that case, it was appropriate to enforce the parties' agreement to split college costs because the dispute centered on a party's ability to pay, which the trial judge determined did not undo the agreement, because there were other sources to fund the obligation. 445 N.J. Super 585. More importantly, in Avelino-Catabran we did not declare agreements to pay for college immutable to a change in circumstances. To the contrary, we held "if circumstances have changed in such a way that strict enforcement of the agreement would no longer be equitable, a court remains free to alter prior arrangements." Id. at 590. Here, the circumstances no longer made it equitable to enforce plaintiff's obligation to support the children and contribute to their college education.

B.

Defendant argues the judge's admission of the therapeutic mediator's notes into evidence was error. She asserts she did not have an opportunity to call the therapeutic mediator as a witness because the court initially ruled her notes would not be evidential. She argues the court's reliance on Rule 5:3-3(a) was misplaced because the therapeutic mediator was not qualified as an expert, could not serve in such a capacity pursuant to Rule 1:40-5(a)(3), and her notes constituted hearsay.

Defendant also argues the judge abused his discretion in permitting the reunification therapist to testify. She alleges the therapist was a social worker and could not testify pursuant to the social worker privilege, N.J.R.E. 518, which the therapist could not waive without the consent of the children and the parties, N.J.R.E. 534(c).

> Our review of the trial court's evidential rulings "is limited to examining the decision for abuse of discretion." Parker v. Poole, 440 N.J. Super. 7, 16 (App. Div. 2015) (quoting Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008)). We will only reverse if the error "is of such a nature as to have been clearly capable of producing an unjust result." Ibid. (quoting R. 2:10-2).
>
> [Ehrlich v. Sorokin, 451 N.J. Super. 119, 128 (App. Div. 2017).]

Rule 5:3-3(g) provides:

An expert appointed by the court shall be subject to the same examination as a privately retained expert and the court shall not entertain any presumption in favor of the appointed expert's findings. Any finding or report by an expert appointed by the court may be entered into evidence upon the court's own motion or the motion of any party in a manner consistent with the rules of evidence, subject to cross-examination by the parties.

Although the admission of the therapeutic mediator's notes without subjecting her to cross-examination was contrary to Rule 5:3-3(g), it does not warrant reversal. The contents of the notes were cumulative of other testimony, and the judge relied on the testimony of the psychologist who evaluated the parties and fact witnesses to draw his conclusions. Furthermore, the most probative evidence of estrangement arose well after the therapeutic mediator became the parent coordinator in 2009 and then resigned in 2010. Therefore, the admission of the notes was not "clearly capable of producing an unjust result." R. 2:10-2. Defendant's remaining arguments relating to the therapeutic mediator are without sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

The decision to permit the reunification therapist to testify did not violate any privilege. Privileges are not absolute. Kinsella v. Kinsella, 150 N.J. 276, 308 (1997). When there is no expectation of confidentiality or privacy, the privilege does not apply. Hedden v. Kean Univ., 434 N.J. Super. 1, 14 (App.

23

Div. 2013). There is no evidence either party or the children had an expectation of privacy vis-à-vis each other or the court regarding the reunification therapy. The therapist provided progress reports to the court prior to the hearing and the goal of therapy was to provide the court insight into and a means of measuring the progress in achieving reunification. The admission of the reunification therapist's testimony was not an abuse of discretion.

## C.

Finally, on the cross-appeal, plaintiff argues the court erred when it failed to award him counsel fees. We discern no abuse of discretion.

Counsel fee determinations rest within the trial judge's sound discretion. Williams v. Williams, 59 N.J. 229, 233 (1971). We will disturb a trial court's determination on counsel fees "only on the 'rarest occasion,' and then only because of clear abuse of discretion." Strahan v. Strahan, 402 N.J. Super. 298, 317 (App. Div. 2008) (quoting Rendine v. Pantzer, 141 N.J. 292, 317 (1995)).

Judge Walsh performed a thorough analysis of the RPC 1.5(a), Rule 4:42-9, and Rule 5:3-5(c) factors and concluded they did not weigh in favor of an award of fees to plaintiff. Substantial, credible evidence in the record supported his decision.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4617-17T4