**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3549-21

K.P.,[1]

     Plaintiff-Respondent,

v.

E.P.,

     Defendant-Appellant.

_____

Argued November 15, 2023 – Decided January 23, 2024

Before Judges Currier and Vanek.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FM-12-0560-16.

Marc J. Rogoff argued the cause for appellant.

K.P., respondent, argued the cause pro se.

PER CURIAM

---

[1] We use the parties' initials pursuant to Rule 1:38-3(a).

Defendant appeals from a June 29, 2022 Family Part order vacating a December 15, 2016 consent order (consent order). Because we are satisfied the trial court did not abuse its discretion in vacating the parties' consent order, we affirm.

I.

The parties divorced on May 23, 2016 and have two children together: E.R.P., born in February 2005, and M.P., born in February 2008. The parties share joint physical and legal custody of the children.

After learning that plaintiff's boyfriend, S.J.L., was a convicted felon,[2] defendant filed an order to show cause seeking to prevent S.J.L. from having any contact with the children. The parties executed a consent order on December 15, 2016, which prevented (1) S.J.L. from being present during plaintiff's parenting time with the children; (2) any form of contact between

---

[2] In 2010, S.J.L. was convicted of second-degree robbery, N.J.S.A. 2C:15-1, and second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1). He was sentenced to seven years in state prison with a three-year parole disqualification period. Prior to these charges, S.J.L. was convicted of criminal mischief for damaging property, N.J.S.A. 2C:17-3(a)(1); third-degree distribution of cocaine on or near school property, N.J.S.A. 2C:35-7; first-degree robbery, N.J.S.A. 2C:15-1; second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a); fourth-degree rioting, N.J.S.A. 2C:33-1(a)(2); fourth-degree resisting arrest, N.J.S.A. 2C:29-2(a); and shoplifting, N.J.S.A. 2C:20-11(b)(1). He served several prison terms for those convictions.

S.J.L. and the children; and (3) "S.J.L.[] from being in the vicinity of any [pickup] or drop[-]off of the children." The children were eleven and eight years old at the time.

The consent order stipulated that the restraints were to be enforced "unless the family counselor opine[d] that it[ was] in the best interest of the children" for S.J.L. to be present during plaintiff's parenting time. The consent order required the parties and children to "attend family counseling to address transition issues, including but not limited to, the impact . . . S.J.L. [was] having upon the children and any new relationships of the parties."

In the ensuing years, plaintiff filed three applications to vacate the consent order. The trial court denied plaintiff's first application in April 2017 and appointed a Guardian Ad Litem (GAL) for the children. In the GAL's reports to the court, she requested the court restrict the parties from discussing the "S.J.L. issue" with the children and recommended the children begin therapy.

Plaintiff filed a second motion to vacate the consent order in February 2019. At that time, the GAL recommended the appointment of a psychologist to conduct a best interest evaluation as to what relationship, if any, S.J.L. should have with the children. Thereafter, the trial court appointed Mathias R.

3

Hagovsky, Ph.D., to determine whether it was in the children's best interest to continue to restrain S.J.L. from being present during plaintiff's parenting time.

Dr. Hagovsky issued his report on January 31, 2021, recommending S.J.L. have contact and a relationship with the children. Plaintiff subsequently filed a third motion to vacate the consent order based on Dr. Hagovsky's report. The court denied the motion without prejudice pending a plenary hearing on the issue.

The plenary hearing was held on July 21 and September 29, 2021. The trial court heard testimony from Dr. Hagovsky, the GAL, defendant, and defendant's witnesses: his nephew, his long-time friend, and plaintiff's sister who is married to defendant's nephew.

During the hearing, Dr. Hagovsky testified that he: interviewed the children individually, separate from the parties; interviewed the parties; observed sessions with the children and each parent; conducted collateral interviews of S.J.L.'s therapist, S.J.L.'s ex-wife and daughter; reviewed the results of psychological testing and conducted home visits.

According to Dr. Hagovsky, the results of the psychological tests were insignificant. Although the testing "suggest[ed] some antisocial and histrionic features," Dr. Hagovsky stated it "f[e]ll far short from a formal diagnosis of

anything coming close to a full personality disorder." Dr. Hagovsky testified that S.J.L. stated in his interview that "he will not be bullied in any way" and "will always react to someone who attempts to bully him" based on his life experiences, particularly his time in prison.

Dr. Hagovsky also testified that S.J.L. said "he had always wanted to be a gangster" and "always had problems with authority." Dr. Hagovsky agreed with defense counsel's characterization of S.J.L. as a "career criminal since he's been a juvenile" and agreed S.J.L. was involved in altercations with defendant, as well as S.J.L.'s friends and family following his release from prison. Although Dr. Hagovsky stated he was concerned about S.J.L.'s comments regarding bullying, he testified he did not have any concerns with S.J.L. having contact with the children.

Dr. Hagovsky also testified regarding two interviews he had with M.P. In the first interview, then eleven-year-old M.P. expressed her difficulty in accepting her mother had a boyfriend so soon after the divorce was finalized. She was aware her father did not like S.J.L.. In discussing M.P.'s second interview—a year later, Dr. Hagovsky testified M.P. "had softened her position":

[S]he still felt that it would be important for her to have as much time as possible with her mom, without anyone there.

But she said that she had gotten to the point that she didn't care anymore. And if that was something that her mom wanted to do, she would be okay with it.

According to Dr. Hagovsky, the tenor of his interviews with E.R.P. were similar. In the first interview, she said she did not like having S.J.L. around since "it was right after the divorce, and she didn't know him." She too was aware her father did not like S.J.L.. But, Dr. Hagovsky said, E.R.P. "was okay with her mother having a boyfriend, and stated that if he ma[de] her mother happy, then that [was] more important to her than her feelings or her father's feelings might be. But she didn't want him around all of the time."

Dr. Hagovsky testified that during the second interview with E.R.P., now a high school sophomore, she indicated:

[S]he . . . told her mother that she didn't have a problem with her boyfriend. And that all she cares about is her mother's happiness. And that she said she is her own person. Doesn't let anybody influence her. She said that she also talked with her father in the past about his girlfriend and her children.

Although she said her dad did not have a girlfriend at the time I spoke with her. But she said it was okay for her mom to have her boyfriend there, just as long as it wasn't all the time. And she felt that as

6

long as she had quality time with her mother alone, then . . . she would be okay with that.

Dr. Hagovsky testified there was no indication from the children that S.J.L. hurt them. He believed the children's objection to S.J.L. was "not what he was doing or what he was saying, but that he was simply there. And they weren't ready . . . to have someone introduced to them so early on after the divorce." When asked if the children would "suffer some kind of psychological harm" if they were not permitted to be around S.J.L., Dr. Hagovsky testified:

> It's my opinion that they are already suffering something. How much of it is hard to tell. But they are already unhappy with the current situation. They told me that. They said they're okay. . . . They would like things to be more normal, is another way to put it, with their mom.
>
> . . . .
>
> It's my opinion that children who are put in a position of conflict between their parents feel responsible for the conflict. It's not that they don't feel responsible. They always feel responsible. It's a question of how much they feel responsible.
>
> So, there's no doubt in my opinion, they didn't tell me this, it's my opinion, as a [p]sychologist, who deals with people and children in these situations, it's my opinion that that is an underlying psychological process that happens to children when they are in a position of conflict between their parents. Which is what this is.
>
> They know that their parents disagree.

A-3549-21

Regarding his interview with S.J.L.'s ex-wife, Dr. Hagovsky testified:

[S]he was well aware that . . . S.J.L. ha[s] had his problems in the past, but . . . he never put the children in harm's way. He has always been a good father. Has turned his life around. And that he has had a considerable amount of contact, she told me, with her children's children, the grandchildren.

She said she understood why [defendant] might feel as he does. But she said he doesn't know . . . S.J.L. certainly like she does. And [she] did not believe that it was the right thing for [defendant] to stand in the way of [S.J.L.] having access to [plaintiff's] children.

During Dr. Hagovsky's interview with S.J.L.'s daughter, she told him that "she has never had any difficulty with having her father around [her] kids." Dr. Hagovsky said the interview

reinforced [his] impression that when it comes to children, as opposed to some of the things that . . . S.J.L. may have done in his life, . . . he appears to be able to act in an appropriate manner. And [it's] sufficient to . . . have someone like his ex-wife and daughter very comfortable with . . . having him around them, and the grandchildren.

Dr. Hagovsky told the court he recommended plaintiff discuss with the children a plan for contact with S.J.L. that "they would be comfortable with" and is "consistent with their needs and expectations," and that defendant allow plaintiff to have a relationship with S.J.L. in the children's presence and to not do anything that would make it more difficult for the children.

8

Dr. Hagovsky testified "[t]his is about being realistic, in my opinion, and moving on." He elaborated:

> If . . . S.J.L. has turned his life around, which he has appeared to have, if he is no longer involved in criminal activity, he's paid his dues, it looks like, from my perspective, in terms of his criminal activity. He has a full[-]time job. He's maintained a relationship with [plaintiff] for several years.
>
> I think it's a question of taking into consideration the ages of the children, and what their needs are, and moving on. That's a challenge for all of them. That's not just for [defendant]. That's a challenge for everybody. But it is in the children's best interest, if that's what they want for their mom, if that's what they want for them, they're old enough now. And I think they should be given an opportunity to do that.
>
> That doesn't mean that, you know, that this is a perfect recommendation, or that it's not possible that it fails. There's no guarantees. I wrote that in my report. . . . I am imploring them to move on. Not to forget. But to move on.

The GAL testified regarding a 2017 incident where defendant, S.J.L., and plaintiff got into a verbal dispute over FaceTime in the presence of the children, who were crying in the room with defendant. According to the GAL, defendant accused plaintiff of driving with the children while drunk, plaintiff accused defendant of being a liar, and S.J.L. yelled at defendant that he would "scr*w [defendant's] mother." The GAL described the incident as "terrible" and that

9

the adults were "[b]ad adults across the board." The GAL further testified she had not been involved in any issues between the parties and the children since 2018.

Defendant's nephew testified that on April 2, 2017, after S.J.L. and plaintiff drove past his house after midnight and yelled out his name, he called the police and filed harassment charges. He testified the parties went to mediation and agreed to mutual restraints and he has not had contact with S.J.L. in four years.

The nephew's wife, who is plaintiff's sister, testified she had a close relationship with plaintiff prior to the divorce, but they were not on speaking terms when plaintiff began dating S.J.L. The nephew's wife testified she was concerned about S.J.L.'s lengthy criminal past and that she did not believe he had changed since the harassment incident. In addressing a harassment complaint that the nephew's wife lodged against S.J.L. on April 5, 2017, she testified S.J.L. sent her "one or two [texts] . . . . introducing himself[,]" but she did not want him texting her.

Defendant's friend also testified. He told the court he was at defendant's house during the 2017 FaceTime incident, and heard S.J.L. say, "how about I

f**k your dead mother" and "come see me" in front of the children, causing E.R.P. to "storm[] out of the room."

During defendant's testimony, he stated he first learned of S.J.L.'s criminal history after E.R.P. searched S.J.L.'s name online. Defendant testified that although there have not been any problems with S.J.L. since they attended mediation in 2017, he does not believe S.J.L. is rehabilitated. Defendant referred to S.J.L.'s comments regarding being a gangster, stating:

> [He said] that he . . . aspired to be a gangster. This was his aspiration in life. And then, not only that, he's got a problem with authority, and anger issues. Has he been cured of this, is there proof of this? Am I willing to take a chance with my two little girls? He's a high[-]risk factor to the welfare of my children.

Defendant told the court he would not agree to allow S.J.L. near his children because of his criminal record.

In February 2022, the court sua sponte ordered in camera interviews of the children, advising the interviews were necessary to assist the court in deciding the children's best interests. Prior to conducting the interviews, the court invited both parties to submit questions to be posed to the children.

The in camera interviews were conducted on February 17, 2022. At the time, M.P. was fourteen and E.R.P. was about to turn seventeen years old. M.P. told the judge that she did not like sharing her mother so soon after the divorce,

11

and that S.J.L.'s immaturity made it uncomfortable to be around him at that time. While she did not think the restriction against S.J.L. had to be so strict, she had told plaintiff she does not want S.J.L. around. M.P. said she did not know what she wanted the court to do.

E.R.P. told the judge that when she was younger, S.J.L. told her she needed to grow up and accept he was going to be in her life which "didn't sit right with [her]." She said she learned about S.J.L.'s criminal background when she searched his name online and came upon his mugshot and criminal record. However, she said she was not bothered being around someone with a criminal record.

E.R.P. told the judge that if S.J.L. was permitted to see her, she would want a limit on the amount of time. She told the judge she has stopped caring as much as she did earlier because the issue has "been going on for too long," she did not want to deal with it, and she wants her mother to be happy.

Following the interviews, the court provided both parties with the interview transcripts and invited them to submit supplemental responses, which they did.

II.

On June 27, 2022, the trial judge issued an oral decision, vacating the consent order. The judge discussed the 2017 harassment incidents. But because there were no criminal charges and the participants agreed to mutual restraints, the judge did not categorize these events as new criminal behavior. The judge also explained it was appropriate for her to interview the children post-trial because a year and a half had passed since the last interviews, and under the court's parens patriae role it "had an obligation . . . to hear for [it]self what these two now much older children had to say."

The judge found the children's responses to her questions were similar to their discussions with Dr. Hagovsky. The children did not want to prevent their mother from being in a relationship with S.J.L. nor did they want to prevent S.J.L. from having a role in their lives. The court found E.R.P. was "fine with it" and M.P. was "still concerned and worried about what's going on, but indicated to the [c]ourt that she would not be adverse, should the [c]ourt permit . . . S.J.L. to be around the children."

The trial judge reasoned:

> . . . S.J.L. was released from prison in 2015. He was released from his conditions of probation or parole by 2018. He has had no relapse since that time. His family members, . . . an ex-wife, a daughter, express support for him in his relationship with children. His counselor said he's been doing fine, and on board. Dr.

Hagovsky administered three particular tests, one including the child abuse, a standardized test to . . . look at child abuse and the propensity for the same. His, all of those testing were within normal range. There is nothing in the record to indicate that at this point in time, the restriction prohibiting [plaintiff] from having . . . S.J.L. in the presence of the now [fourteen] and [seventeen] year old daughters would be inimical to their best interests.

. . . [T]he [c]ourt finds, based on looking at the case law, the facts that were presented, its own interviews with the children, its consideration of what the [GAL] had found a number of years ago, and what Dr. Hagovsky found in his report, and his very, very credible testimony at the time of trial, that it is appropriate for the [c]ourt to vacate the consent order of December of 2016.

III.

On appeal, defendant contends the trial court abused its discretion in vacating the consent order because plaintiff did not show it was in the children's best interest for them to have contact with S.J.L. In addition, defendant asserts the court further abused its discretion in conducting in camera interviews of the children five months after the close of the trial.

"We review the Family Part judge's findings in accordance with a deferential standard of review, recognizing the court's 'special jurisdiction and expertise in family matters.'" Thieme v. Aucoin-Thieme, 227 N.J. 269, 282-83 (2016) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). "[F]indings by the

14

trial court are binding on appeal when supported by adequate, substantial, credible evidence." Id. at 283 (quoting Cesare, 154 N.J. at 411-12).

Deference is accorded because of the family courts' "specialized knowledge and experience in matters involving parental relationships and the best interests of children." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 427 (2012). A "[c]ourt finds an abuse of discretion when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" U.S. Bank Nat'l Ass'n v. Guillaume, 209 N.J. 449, 467-68 (2012) (quoting Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88, 123 (2007)).

In contrast, "all legal issues are reviewed de novo." Ricci v. Ricci, 448 N.J. Super. 546, 565 (App. Div. 2017) (citing Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013)).

## A.

We begin by addressing defendant's contention that the trial court abused its discretion in vacating the consent order and allowing S.J.L. to be around the children. Defendant asserts there is no evidence S.J.L.'s presence benefits the children's lives. He contends that Dr. Hagovsky did not consider that issue and instead focused on plaintiff's happiness. Defendant further contends that S.J.L.'s

long violent criminal background "poses inherent risks to the children," there is no evidence the risks have subsided, and the trial court erred in finding defendant had not relapsed into criminal activity since his release from prison in 2015.

After reviewing the record, we discern no reason to disturb the trial judge's June 29, 2022 order vacating the parties' consent order. Both Dr. Hagovsky and the GAL recommended to the court that S.J.L. could have a role in the children's lives. Dr. Hagovsky specifically testified that he found it was in the children's best interest for the parties to move forward in their lives and for defendant to stop being a barrier regarding S.J.L.. The GAL concluded in her report to the court that S.J.L.'s criminal past alone was not enough to uphold the consent order.

We note that defendant's initial concerns regarding S.J.L.'s behavior in 2016 and 2017 are supported by the parties' family members' testimony, the children's accounts, and in some of the findings of the psychological tests conducted by Dr. Hagovsky. S.J.L. said some vulgar and inappropriate things in front of the children. Harassment charges were filed, though ultimately resolved in mediation.

16

However, those events were over five years ago and there have been no new reported incidents. In their most recent interviews, neither daughter expressed any concern for harm or danger regarding S.J.L..

In light of the change in circumstances, the court did not abuse its discretion in vacating the consent order. The court carefully considered the testimony of numerous witnesses, including the expert opinion of a psychologist, who the court found credible, and determined that it was appropriate and in the children's best interest to vacate the consent order and permit plaintiff, with the input of the children, to arrange a plan for contact with, and inclusion of, S.J.L. in the children's lives. The daughters are older and less opposed to S.J.L.'s presence, and plaintiff and S.J.L. have had a long and stable relationship.[3] Therefore, the trial court's decision to vacate the consent order was supported by the evidence in the record.

## B.

We briefly address defendant's contention that the trial court abused its discretion when it conducted an in camera interview of the children five months after the close of the plenary hearing. Defendant asserts the court's interviews were inappropriate because there was no legal basis to support them, an expert

---

[3] Plaintiff states in her brief that she and S.J.L. became engaged in April 2022.

evaluation of the children had been conducted, the parties had "already submitted proposed findings of fact and . . . law" to the court, and the court had no special expertise in interviewing children.

Although this was not a custody determination, we find Rule 5:8-6 helpful here as it provides the proper procedure for the trial court to follow when conducting an in camera interview:

> As part of the custody hearing, the court may on its own motion or at the request of a litigant conduct an in camera interview with the child(ren).  In the absence of good cause, the decision to conduct an interview shall be made before trial. . . . .  If the court elects to conduct an interview, it shall afford counsel the opportunity to submit questions for the court's use during the interview and shall place on the record its reasons for not asking any question thus submitted.

Here, the trial judge determined she had good cause to conduct the post-trial interviews with the children because it would assist her in determining the children's best interest.  She noted more than a year had elapsed since the last interview.  The judge invited both parties to submit questions prior to the interviews.  Afterwards, the court provided the parties with transcripts of the interviews and invited them to submit supplemental responses.

The trial court's decision to conduct an in camera interview of the children was within its discretion and the court conducted the interview in accordance with Rule 5:8-6.  Therefore, we discern no reason to disturb the court's decision.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3549-21